**Ana Estela GUEVARA FLORES, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 84–4767.

United States Court of Appeals, Fifth Circuit.

April 11, 1986.

Lisa S. Brodyaga, Thelma O. Garcia, Harlingen, Tex., for petitioner.

Allen W. Hausman, Edwin Meese, Atty. Gen., U.S. Dept. of Justice, Robert L. Bombough, Director, Asst. Director, Office of Immigration Litigation, Civ. Div., Washington, D.C., for respondent.

David H. Lambert, Dist. Director, I.N.S., New Orleans, La., for Other Interested Parties.

**1244**

Before BROWN, REAVLEY, and HILL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In this appeal, an alien seeks review of a decision by the Board of Immigration Appeals denying her motion to reopen her application for asylum in the United States. Because we conclude that the new evidence proffered by the alien constituted a prima facie showing that she was entitled to the relief she requested, and because she has shown a reasonable likelihood that the relief she seeks may be warranted as a matter of administrative discretion, we reverse the decision of the Board. We therefore remand the case for a reopening of the alien's asylum application before the Immigration Law Judge.

*A Case of Mistaken Identity*

Ana Estela Guevara Flores (Guevara) is a 36 year old native of El Salvador. On or about June 24, 1981, Guevara entered the United States by surreptitiously crossing the border near Laredo, Texas. She was apprehended when Border Patrol agents found her, and twelve other aliens, hiding in a railroad freight car near Cotulla, Texas. At the time of her arrest, Guevara was carrying a tape of the last Mass of the Archbishop Oscar Romero.[1] She was also carrying letters of introduction to church activists in Puerto Rico written in what the Federal Bureau of Investigation (FBI) termed "classic marxist rhetoric."

The Border Patrol believed these materials to be of a suspicious nature, so it turned them over to the FBI, which commenced a foreign counterintelligence investigation for the purpose of ascertaining Guevara's identity. According to counsel

for the United States, confidential FBI sources led that agency to suspect that Ana Guevara was a Salvadoran guerrilla leader known by the *nomme de guerre* Comandante Norma. The FBI, therefore, prevailed upon the United States Embassy in El Salvador to obtain a fingerprint card from Salvadoran authorities for Comandante Norma, whose true name is Norma Fidelina Guevara de Grande. The possibility that the notorious comandante Norma had been apprehended in Texas received a good deal of play in the Salvadoran press.

The fingerprint comparisons eventually revealed that Ana Guevara was not, in fact, Comandante Norma. The Salvadoran authorities acknowledged that Guevara was not a known guerrilla or a subversive, but they indicated that possession of "subversive literature" was a crime for which Guevara could be detained upon her return to El Salvador.[2] The Salvadoran authorities, therefore, requested the date and number of Guevara's flight in the event she was deported to El Salvador, and asked that copies of the documents in her possession be furnished to the plane's captain for delivery to Colonel Eugenio Vides Casanova, Director General of the Salvadoran National Guard.[3]

Because she entered the United States surreptitiously, Guevara came to the attention of yet another federal agency, the Immigration and Naturalization Service (INS). On the date of her apprehension, Guevara was served with an Order to Show Cause which demanded that she prove she was not subject to deportation under the terms of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2). She was also charged with entering the United States

---

**1.** Archbishop Romero was head of the Catholic Archdiocese of El Salvador until he was assassinated during the civil strife in that country.

**2.** Guevara obtained this information from three FBI documents released to her under the Freedom of Information Act, 5 U.S.C. § 552. The documents pertain to the FBI's investigation of Guevara and were pertinent to the contentions she raised in her asylum application. For reasons that do not appear in the record, however,

the documents were not released to Guevara until roughly two years after Guevara's October 8, 1981 deportation hearing before the Immigration Judge.

**3.** Colonel Vides Casanova, then head of the Salvadoran National Guard, has since been promoted to the rank of General and had assumed the post of Minister of Defense in the current Salvadoran government.

without inspection by immigration authorities, a violation of 8 U.S.C. § 1325.

Guevara, who was unrepresented by counsel at the time, pleaded guilty to the charge that she had violated § 1325. She was sentenced to, and served, a term of ninety days in jail for this offense. The Show Cause Order was set for a hearing before an Immigration Judge on October 8, 1981. At this hearing Guevara conceded the illegality of her entry into the United States, but requested asylum in this country by virtue of her status as a refugee under 8 U.S.C. §§ 1101(a)(42)(A), and 1158(a). In accordance with INS regulations, 8 C.F.R. § 208.2, Guevara filled out Form I-589 entitled "Request for Asylum in the United States."

Guevara, however, left a number of spaces on the form and its addendum blank.[4] She failed to complete the form because of her belief that communications between the United States government and the authorities in El Salvador had already placed her in "extreme jeopardy." In her words

> The United States government has informed the Junta that they have arrest (sic) "La Comandante Norma Guevara." Even though I am not la comandante, the Junta believes that I am, or if they by now recognize that I am not, they consider me to be a revolutionary, thanks to the U.S. Government, and will kill me on return.

Because she had been accused of being Commander Norma, Guevara stated that she could not complete the remainder of Form I-589 without a guarantee that the contents of her asylum application would remain confidential and would not be the subject of further disclosures to the Salvadoran authorities.

INS, as a matter of policy, forwards all asylum applications to the State Department for an advisory opinion on the merits of the application. Accordingly, Guevara's deportation hearing was recessed while the materials pertinent to her application were forwarded to the Asylum Division at the State Department for their analysis. The State Department concluded that Guevara had failed to meet her burden of proving that she possessed a well-founded fear of persecution if she were to be deported to El Salvador. The Department's opinion was based, in large part, on Guevara's failure to provide information relevant to her claim on Form I-589. The Immigration Judge, therefore, offered her the opportunity to supplement her responses, but in the absence of a guarantee that the contents of her application would remain confidential, Guevara declined to do so.

Upon receipt of the State Department's opinion, Guevara's deportation hearing was reconvened. At the hearing, Guevara moved for the issuance of administrative subpoenas pursuant to 8 C.F.R. § 287.4. She sought production of all communications pertaining to her between the United States Government and the Salvadoran authorities. In support of the motion, her attorney stated that Guevara sought these communications not only for the purpose of showing that her case had received consid-

---

**4.** The information Guevara refused to provide covered sixteen categories on Form I-589 and included:

(1) her addresses for the past five years;
(2) the identities and addresses of relatives in the United States;
(3) whether she had taken any actions which she believed would result in her persecution in El Salvador;
(4) whether her family had suffered or been intimidated as a result of her actions;
(5) whether she had other information pertaining to her application that was not covered by the questions on Form I-589;
(6) where she had been employed in El Salvador;

(7) her last address in El Salvador and her reason for leaving her country;
(8) how she traveled from her country, other nations—if any—through which she passed on her way to the United States, and whether she had applied for asylum in any other country;
(9) why she continued traveling to the United States;
(10) whether she had ever belonged to any organizations hostile to the interests of her home country;
(11) the identities and addresses of her relatives outside the United States; and,
(12) specific dates, locations, and incidents in which she had been subjected to persecution.

erable publicity in El Salvador, but also to show that the communications between the two governments had substantially increased the likelihood that she would be persecuted upon her return to Salvadoran territory. The Immigration Judge, however, denied the motion. He found that much of the information sought was merely cumulative and stated that the information which was not cumulative was more appropriately obtained through a request under the Freedom of Information Act.

Guevara then appealed the decision of the Immigration Judge to the Board of Immigration Appeals (the Board). The Board, in a brief per curiam opinion, affirmed the denial of Guevara's asylum application on the grounds that she had failed to meet her burden of proof. Guevara also contended that the Immigration Judge had erred in denying her requests for confidentiality, but the Board concluded that the Judge had taken "all appropriate measures within his authority to safeguard such confidentiality, including closing the hearing to the public. He could do no more." The Board also affirmed the denial of Guevara's request for administrative subpoenas.

Within a month of the Board's decision, however, the FBI declassified and released three documents, pursuant to Guevara's Freedom of Information Act request, which had not been available at her hearing before the Immigration Judge or during the pendency of her appeal to the Board. The first document was a transmission from a legal attache in Panama to the Director of the FBI which reported that "the detention of a young woman alleged to be Norma Fidelina Guevara ... has received a good deal of play in the Salvadoran press." It continued "we are making inquiries here to determine whether the person apprehended in the United States using the name Ana Estela Guevara Flores might in fact be the person press accounts allege to be Norma Fidelina Guevara...."

The second document was a transmission from the San Antonio, Texas office of the FBI to FBI Headquarters in Washington. It was this document that identified the communications Guevara was carrying when apprehended as ones "written in classic marxist rhetoric." The document also contained the following information:

> The Salvadoran government through Legat, Mexico City has requested that they be advised when [Guevara] is deported to El Salvador and also request[s] the communication she had i[n] her possession.

The final document was a second transmission from the Legal Attache in Panama to the Director of the FBI. It informed the FBI that Salvadoran authorities had determined that Guevara was not a known guerilla, nor was she the notorious Comandante Norma. The authorities stated, however, that possession of subversive literature in El Salvador was a crime for which Guevara could be detained upon return to her country. They then reiterated their request for the date and flight number of Guevara's return to El Salvador in the event she was deported, and requested that copies of the documents she was carrying be forwarded for analysis to Colonel Vides Casanova, Director General of the Salvadoran National Guard.

Upon receiving these documents, Guevara filed a motion to reopen her asylum application. In it, she sought to have the Board remand her case to the Immigration Judge so that he might reevaluate her claim that she possessed a well-founded fear of persecution in light of this new evidence.[5]

The Board considered Guevara's request in light of a well-settled line of cases holding that motions to reopen should be granted only when the alien can establish, in light of the new evidence, a prima facie case of eligibility for the relief she seeks. *See, e.g., Immigration & Naturalization Service v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981); *Marcello v.*

---

5. In order to obtain reopening, an alien must prove that the new evidence she seeks to offer is material and was not available and could not have been discovered or presented at the former hearing. 8 C.F.R. § 3.2 (1985).

*Immigration & Naturalization Service,* 694 F.2d 1033, 1035 (5th Cir.1983). The Board evaluated the FBI documents and concluded that they did not "establish a prima facie case of either a clear probability that her life or freedom would be threatened or a well-founded fear of persecution in El Salvador." It reasoned that the documents proved only that "the respondent may be questioned or detained in El Salvador in connection with an investigation into whether she is a terrorist subversive, not that she would be executed for her political beliefs." The Board, therefore, denied Guevara's motion to reopen and this appeal followed.

Guevara raises three contentions on appeal. First, she argues that the Board erred in denying her motion to reopen her hearing before the Immigration Judge. Second, she asserts that the Immigration Judge abused his discretion in refusing to guarantee that the contents of her asylum application would be held in confidence. Finally, she contends that it was an abuse of discretion to refuse to issue the subpoenas she sought at her deportation hearing.

We believe that the Board's decision to deny Guevara's motion to reopen was an abuse of its discretion. Therefore, we reverse and remand with directions that Guevara be permitted to reopen her application before the Immigration Judge. Guevara's other contentions, however, are without merit and the decision of the Board is, in those respects, affirmed.

### Reopening

The initial contention raised by Guevara is that the Board abused its discretion in denying her motion to reopen her case before the Immigration Judge. She sought to introduce as new evidence the three FBI documents she had obtained through her FOIA request. These documents, she asserts, were material to her contention that she harbored a well-founded fear of persecution. She describes their contents as "tantamount to a note from [her] dictator" demonstrating a likelihood of official action against her by the Salvadoran government.

The Board of Immigration Appeals considered Guevara's motion to reopen in accordance with the procedures set out by INS regulations. Those regulations impose upon an alien who seeks reopening the burden of proving that the evidence she seeks to introduce is "material evidence [that] was not available and could not have been discovered at the former hearing." 8 C.F.R. § 3.2. While conceding that the evidence Guevara sought to offer was unavailable at the former hearing, the Board rejected her contention that the evidence was material. It held that the evidence did not prove that Guevara was likely to be persecuted upon her return to El Salvador; rather, the Board concluded that the documents proved only that she was likely to be detained and interrogated upon her return. Thus, the Board denied Guevara's motion to reopen, a decision which she now challenges on appeal.

The scope of appellate review of a decision denying a motion to reopen is very limited. Generally, in order to obtain reopening on appeal, an alien must make a prima facie showing that there is a reasonable likelihood that the relief sought would be granted at the reopened hearing.

> The prima facie showing includes not only that there is a reasonable likelihood that the statutory requirements for the relief sought are satisfied, but also a reasonable likelihood that a grant of relief may be warranted as a matter of discretion.

*Marcello v. Immigration & Naturalization Service,* 694 F.2d 1033, 1035 (5th Cir. 1983). Thus, on appeal we must address two issues: whether the alien has shown (i) a reasonable likelihood that she has met the statutory requirements for the relief sought, and (ii) a reasonable likelihood that her case warrants the exercise of discretion in her favor.

### The Statutory Framework

There are, in fact, two statutory remedies available to an alien who seeks to avoid deportation from the United States. The first is contained in 8 U.S.C.

§ 1253(h)(1), the statutory provision for withholding of deportation. This provision states that:

The Attorney General *shall not deport or return* any alien .. to a country if the Attorney General determines that such alien's life or freedom *would be threatened* in such country on account of race, religion, nationality, membership in a particular social group or political opinion.

(Emphasis added). Withholding of deportation, then, is a mandatory remedy available upon the alien's objective evidentiary showing that his life or freedom "would be threatened." *Id.*

The second remedy available to an alien is asylum. Until 1980, the Immigration and Nationality Act contained no formal mechanism for addressing requests for asylum made by refugees physically present in the United States. In that year, the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102, was enacted to bring United States immigration laws into conformity with the United Nations Convention Relating to the Status of Refugees.[6] The Refugee Act amends the Immigration and Nationality Act and defines as a refugee one who

... is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A). At 8 U.S.C. § 1158(a), the Refugee Act goes on to instruct the Attorney General to

... establish a procedure for an alien physically present in the United States or at a land border or port of entry, irre-

spective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determined that such alien is a refugee within the meaning of section 101(a)(42)(A)[8 USCS § 1101(a)(42)(A) ].

The mechanism by which an alien may apply for asylum is codified at 8 C.F.R. § 208 (1985). That regulation requires that an applicant for asylum

... establish that he/she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of the country of such person's nationality or, in the case of a person having no nationality, the country in which such person habitually resided, because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* In short, asylum is a form of discretionary relief which the Attorney General may grant to an alien who proves he possesses a "well-founded fear of persecution." *Id.*

Guevara has applied for asylum in the United States. She, like all other aliens who seek relief from deportation orders, bears the burden of proving that she has met the statutory requirements for relief she seeks. What she must prove to meet her evidentiary burden, however, is unclear. In *Immigration & Naturalization Service v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984), the Supreme Court construed 8 U.S.C. § 1253, the statutory provision for mandatory withholding of deportation, and concluded that an alien seeking that statutory remedy must prove a clear probability of persecution in his native country before he is entitled to relief. 104 S.Ct. at 2501. Asylum, however, is quite a different statutory remedy and in *Stevic* the Court specifically refused to determine

---

**6.** The United States agreed to comply with the provisions of this convention when it acceded to the United Nations Protocol Relating to the Sta-

tus of Refugees on January 31, 1967. *See* 19 U.S.T. 6224, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

the meaning of the phrase "well-founded fear of persecution" which is applicable by the terms of the Act and regulations to requests for discretionary asylum.

*Id.*

Since the Supreme Court has declined to determine this issue, we must construe the language of the asylum regulation ourselves to determine whether Guevara has met the burden imposed on her by law.[7] Section 208.5, promulgated pursuant to the delegation of authority in 8 U.S.C. § 1158, is the regulation which governs grants of asylum. It is written in disjunctive form. It states that the alien must prove she is unable to avail herself of the protection of her homeland because of *persecution or a well-founded fear of persecution.* 8 C.F.R. § 208.5 (emphasis added). The parties concede that Guevara cannot prove that she has been or will be persecuted within the meaning of the first element of the test; thus, we must construe the term "well-founded fear of persecution."

As we see it, the well-founded fear of persecution standard is at least partially subjective, because fear is a state of apprehension or anxiety not usually subject to rational measurement. *See Cardoza-Fonseca v. Immigration & Naturalization Serv.,* 767 F.2d 1448, 1452 (9th Cir. 1985), *cert. granted,* — U.S. —, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986) (well-founded fear refers to subjective state of mind). The standard is only partially subjective, however, because it requires that the fear be a well-founded one. The alien's fear must have some basis in the reality of the circumstances; mere irrational apprehension is insufficient to meet the alien's burden of proof. *See Bolanos-Hernandez v. Immigration & Naturalization Serv.,* 767 F.2d 1277, 1283 (9th Cir.1984) (alien must establish existence of a valid reason for fear). The term "persecution," in turn, contemplates a showing by the alien that "harm or suffering will be inflicted upon [her] in order to punish [her] for possessing

a belief or characteristic a persecutor sought to overcome." *Matter of Acosta,* Interim Decision No. 2986 (March 1, 1985). *See also Cardoza-Fonseca,* 767 F.2d at 1452 (persecution is infliction of suffering or harm upon one who differs in a way regarded as offensive to the persecutor).

■ Our reading of the regulation persuades us that the meaning of the term "well-founded fear of persecution" can be clearly and concisely stated. An alien possesses a well-founded fear of persecution if a reasonable person in her circumstances would fear persecution if she were to be returned to her native country. In so holding, we stand with the Sixth, Seventh, and Ninth Circuits which have previously determined that the "well-founded fear of persecution" standard imposed on asylum applicants differs from the "clear probability of persecution" standard imposed by *Stevic* on aliens who seek withholding of deportation. *See Youkahanna v. Immigration & Naturalization Serv.,* 749 F.2d 360, 362 (6th Cir.1984) (clear probability of persecution standard applies only to petitions for withholding of deportation); *Carvajal-Munoz v. Immigration & Naturalization Serv.,* 743 F.2d 562, 574–75 (7th Cir.1984) (burden on asylum applicant is similar, but not identical, to that imposed by clear probability standard); *Bolanos-Hernandez v. Immigration & Naturalization Serv.,* 767 F.2d 1277, 1283 (9th Cir.1984) (clear probability of persecution required for withholding of deportation, but alien seeking asylum need only establish a valid reason for fear).

We recognize that the Third Circuit has held that there is no difference between the proof required of an alien seeking asylum and that which is required of an alien who seeks withholding of deportation. *See Sotto v. Immigration & Naturalization Serv.,* 748 F.2d 832, 836 (3d Cir.1984). In doing so, the Third Circuit relied heavily upon one of its own, pre-*Stevic* decisions, *Rejaie v. Immigration & Naturalization*

---

7. This is an issue of first impression in our Circuit. *See Bahramnia v. Immigration & Naturalization Serv.,* 782 F.2d 1243 (5th Cir.1986);

*Carmona v. Immigration & Naturalization Serv.,* 782 F.2d 1039 (5th Cir.1986).

*Serv.*, 691 F.2d 139 (3d Cir.1982), in which it had concluded that the "well founded fear" and "clear probability" standards were identical. While that Court was constrained by its own jurisprudence, we find its reasoning in both *Sotto* and *Rejaie* to be neither persuasive or decisive.

Withholding of deportation is a *mandatory* form of relief to which an alien is *entitled* upon the Attorney General's determination that the alien's life or freedom *would be threatened* if the alien were returned to her native country. 8 U.S.C. § 1253. Asylum, on the other hand, is a *discretionary* remedy which *may be* granted to an alien upon a showing that the alien cannot return to her native country because of *persecution or a well-founded fear of persecution.* 8 U.S.C. § 1158, 8 C.F.R. § 208.5. The linguistic difference between the words "well-founded fear" and "clear probability" may be as striking as that between a subjective and an objective frame of reference. The difference in result which obtains when an alien meets the burden of proof imposed on an asylum claim and that which is imposed for withholding of deportation is equally as dramatic. We simply cannot conclude that the two standards are identical.[8]

■ Our determination that the proof required of asylum applicants differs from that required of aliens who seek withholding of deportation is consistent with the structure of the Immigration and Naturalization Act. In the words of the Seventh Circuit.

Establishing an *entitlement* to withholding of deportation ... *should require a greater evidentiary burden than establishing 'refugee' status so as to be eligible for a discretionary grant of asylum.* *Carvajal-Munoz,* 743 F.2d at 575 (emphasis original). We agree that the evidentiary burden for establishing entitlement to withholding of deportation should be greater than that imposed on aliens who seek asylum, and we therefore decline to follow the Board's interpretation in *Acosta.*

### The Prima Facie Case

■ Guevara has met her burden on appeal of proving a reasonable likelihood that she will meet the statutory requirements for asylum on reopening. *See Marcello,* 694 F.2d at 1035. The FBI documents indicate that the head of the Salvadoran military has personally taken an interest in her case. In addition, the Salvadoran authorities expressed an interest in obtaining the date and number of Guevara's flight, and in obtaining copies of the documents she had in her possession when she was arrested—documents which the authorities described as subversive literature. In light of that factual context, we think that a reasonable person in Guevara's circumstances would fear persecution on return to her native country. Thus, while we express no opinion as to the merits of Guevara's case on remand, we find that she has made a prima facie showing of a well-founded fear of persecution.

The fact that Guevara has made a prima facie showing that she is likely to meet the

---

8. We are aware that the Board of Immigration Appeals has interpreted the standards for asylum and withholding of deportation to be identical in its recent decision in *Matter of Acosta,* Interim Decision Number 2986 (March 1, 1985). Ordinarily, this interpretation would be entitled to deference, *see Udall v. Tallman,* 380 U.S. 1, 19, 85 S.Ct. 792, 802, 13 L.Ed.2d 616, 627 (1965), but analysis of the differences between the two remedies provides us with "compelling indications that [the Board's interpretation] is wrong." *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969).

We disagree with the Board's interpretation in *Acosta* because it ignores the fact that the INS'

own regulation is written in the disjunctive. Section 208.5 states that "an asylum applicant bears the burden of proving she is unable to return to her homeland because of persecution *or* a well-founded fear of persecution." The two phrases cannot be synonymous, any more than they can be coextensive, because each is an alternative method by which the alien can meet the statutory standard. It is a canon of statutory construction that, where possible, a statute should be read so as to give meaning to each of its clauses. Reading the two standards as coextensive has the effect of rendering the words "well-founded fear of persecution" mere surplusage. This we cannot do, so we decline to adopt the Board's interpretation.

statutory requirements on remand is not, however, the end of the inquiry. We are also required by *Marcello* to find "a reasonable likelihood that a grant of relief may be warranted as a matter of discretion." 694 F.2d at 1035. This issue was not squarely addressed by the briefs, but on these facts we certainly recognize that the Immigration Judge could reasonably exercise his discretion to allow asylum.[9]

■ We hold that Guevara has made a sufficient showing on appeal of a well-founded fear of persecution to permit determination of her claim by the Immigration Judge. This was factual information needed by the trier of fact—the Immigration Judge—on whom rests the initial, and sometimes decisive, burden of exercising congressionally imposed discretion. The Immigration Judge did not have this information, even though he needed it. The action of the Board, in its hindsight consideration, cannot supplant the Immigration Judge's right and duty to look at, and evaluate, this evidence. Guevara is, therefore, entitled to reopen her case before the Immigration Judge so that he may consider the FBI documents that Guevara has obtained since her initial hearing.

### Confidentiality

■ Guevara's second contention on appeal is that the Government abused its discretion by failing to guarantee that the contents of her asylum application would be held in confidence by the INS. Her claim is premised upon her belief that the government breached its own official policies when it communicated directly with the Salvadoran government for the purpose of ascertaining her identity. Those disclosures, she claims, interfered with her ability to complete her asylum application in the confidence that its contents would not be disclosed and, therefore, deprived her of

her ability to meaningfully apply for asylum.

Whatever Guevara's distress that her identity and activities have been called to the attention of the Salvadoran authorities, the awareness of such authorities does not result from a disclosure by the INS of the contents of Guevara's asylum application. Rather, the Salvadoran authorities became aware of Guevara by virtue of the FBI's disclosures during the course of its foreign counterintelligence investigation. While this, from Guevara's perspective, may be unfortunate, it is not a state of affairs that INS can, or through our orders, should correct.

The FBI is charged, with others, with protecting the security of the United States from foreign criminals, subversives, and terrorists. When it learns of an alien who has entered this country under suspicious circumstances, the FBI may properly, through official governmental channels, contact the authorities in the alien's home country to ascertain whether the alien represents a threat to the security of the United States. It would be naive to assert— and even more so to hold—that information pertaining to an alien may *never* be the subject of communications with the authorities in the alien's home country. Guevara's request for a blanket guarantee against all such communications or disclosures is without merit.

The INS, however, is charged with the rather less glamorous task of enforcing the immigration laws. INS policy is, and has been, to protect the confidentiality of asylum applications. In fact, it is INS policy "to refuse to disclose any asylum application without the consent of the asylum applicant."[10] The United States Department of State, to whom INS turns for advisory ·

---

9. Bound as we are by *Marcello*, we cannot refrain from pointing out that to require an advance holding that the Immigration Judge would exercise his discretion in favor of asylum is a contradiction in terms. Discretion can scarcely be so circumscribed.

10. *See* Memorandum of David H. Lambert, Acting Associate Regional Commissioner of Examinations—Southern Region, Immigration and Naturalization Service, dated February 11, 1982.

opinions regarding the merits of particular asylum applications, has a similar policy.[11]

The disclosures of which Guevara complains did not originate with the INS, nor did they have as their source the contents of an asylum application which had as yet to be filed. The FBI investigation in this case took place months before Guevara applied for asylum by partially completing Form I–589. Even had the application been on file at the time of the FBI disclosures, however, that fact would not have precluded the FBI from undertaking investigations which arose independently of the contents of the application itself.

There is no evidence in the record that INS has ever strayed from its policy of confidentiality with regard to the contents of Guevara's asylum application. Since the contents of the application have been held in confidence, the alien has received all of the guarantees of confidentiality to which she is entitled. We therefore dismiss as without merit Guevara's contention that the government has breached its own policies regarding the confidentiality of asylum applications.

### Subpoenas

■ At her hearing before the Immigration Judge, Guevara sought to obtain an administrative subpoena under 8 C.F.R. § 287.4(a)(2). She sought two categories of material in her request. The first concerned the documents seized from her at the time of her arrest, and the second encompassed all communications between the governments of the United States and El Salvador regarding Guevara.

The motion for administrative subpoenas was denied by the Immigration Judge at the deportation hearing. On appeal, the Board concluded that the subpoenas had been properly denied because Guevara had failed to meet her burden of proving that the materials she sought were essential to her case and were otherwise unavailable. *See* 8 C.F.R. § 287.4(a)(2). Guevara contends that this decision was an abuse of the Board's discretion.

Our inquiry under an abuse of discretion standard is whether the agency exercised its discretion in a manner that was arbitrary and capricious. *Chokloikaew v. Immigration & Naturalization Serv.*, 601 F.2d 216 (5th Cir.1979). We have reviewed the record and we cannot say that the decision to deny issuance of the subpoenas was an abuse of discretion. Thus, the decision of the Board on this issue is affirmed.

### Conclusion

Over four years have elapsed since Guevara illegally entered the United States. Still more time will pass before her case reaches its final disposition. While we are reluctant to burden the progress of summary deportation proceedings with a remand in this case, we are left with no alternative. Guevara is entitled to reopen her asylum application before the Immigration Judge, so we reverse the decision of the Board and remand for proceedings not inconsistent with this opinion. In all other respects, however, the decision of the Board is affirmed.

---

11. "As a matter of policy and practice, information obtained from an asylum applicant, including the application, is held in confidence and we seek to maintain the confidentiality of such information." Letter of L. Arthur, Chief, Asylum Division, Bureau of Human Rights and Humanitarian Affairs, United States Department of State dated December 18, 1981.

On occasion the State Department may need to verify information contained in an asylum application. When such a need arises, the State Department avoids any attempt to contact the authorities in the alien's country. Instead, it sends a confidential cable to the United States Embassy in the alien's home country outlining the circumstances of the alien's case and the information which must be verified. Accompanying each such cable is the following caveat: Department's policy is to preserve confidentiality of asylum applications and [their] contents. Thus, information in this telegram about asylum requests should be divulged only to U.S. citizen personnel on need to know basis. If post in preparing reply needs to acquire or check information from local sources, it may do so but without divulging that asylum application ha[s] been filed in U.S.

*See* Letter of W. Tapley Bennett, Jr., Assistant Secretary of State for Legislative and Intergovernmental Affairs.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.