UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-4303
_____


ELIAS JOSEPH FADDOUL,

Petitioner,

versus

IMMIGRATION AND NATURALIZATION
SERVICE,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____
(October 25, 1994)


Before JOHNSON, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Elias Faddoul (Faddoul) appeals an order of the Board of Immigration Appeals (BIA or Board) denying his requests for asylum and withholding of deportation. In the alternative, Faddoul argues that we should reinstate the BIA's grant of voluntary departure. Finding that the BIA properly denied his requests, we affirm. We also deny his request to extend his voluntary departure date.

**Facts and Proceedings Below**

Faddoul is a thirty-three year old man of Palestinian ancestry who was born and last resided in Saudi Arabia. His parents fled

Palestine after the creation of Israel in 1948, first settling in Lebanon, then moving to find work in Saudi Arabia, where Faddoul was born and raised. Despite his place of birth, Faddoul was not eligible to receive Saudi citizenship because Saudi law grants citizenship solely on the basis on ancestry. As a person of Palestinian ancestry, Faddoul was unable to obtain a Saudi passport but was allowed to travel with a Lebanese travel document known as a "laissez-passe".[1] Faddoul first visited the United States in 1979 and thereafter returned to Saudi Arabia periodically to renew his Saudi reentry visa. In 1984, Faddoul entered the United States as a nonimmigrant student to study aviation and electronics, but he ceased attending classes in May 1985. During this time, he formed a relationship with a U.S. citizen and was married in October 1984. Because he planned to apply for permanent legal status, he stopped returning to Saudi Arabia and allowed his reentry visa to expire. The marriage, however, eventually failed.

On September 22, 1986, the Immigration and Naturalization Service (INS) began deportation proceedings against Faddoul and issued an Order to Show Cause alleging deportability under the Immigration and Naturalization Act (INA) § 241(a)(9), 8 U.S.C. § 1251(a)(9), for his failure to comply with the conditions of his nonimmigrant status. On August 5, 1987, an immigration judge (IJ) found Faddoul deportable and denied his request for asylum under

---

[1] This document was stamped "Not valid for reentry to Lebanon." Although Faddoul's parents temporarily resided in Lebanon after fleeing Palestine, Faddoul does not appear to have (or have had) any other contact with Lebanon and has only visited the country once.

INA § 208(a), 8 U.S.C. § 1158(a), and withholding of deportation under INA § 243(h), 8 U.S.C. § 1253(h), but granted him voluntary departure until December 31, 1987.

In November 1987, a fire at a detention center destroyed Faddoul's immigration papers and the BIA remanded his case to the IJ for a new hearing. Faddoul's second hearing commenced June 22, 1989. The IJ once again found him deportable but allowed him to submit a written application for asylum. Faddoul claimed that, assuming Saudi Arabia permitted him to return, he would face persecution because the government severely restricted the rights of Palestinians. In particular, Saudi law forbade all non-Saudis from owning property or businesses, attending certain schools, and marrying Saudis. Non-Saudis were also prohibited from travelling within Saudi Arabia without written permission and were only permitted to remain in the country so long as they were sponsored by a Saudi employer or received derivative sponsorship through their parents' employment. In addition, Faddoul claimed that Saudi Arabia would likely prohibit him from returning at all because his reentry visa had expired and he could no longer receive derivative sponsorship due to his age. He speculated that were he to return to Saudi Arabia without a visa, he could face imprisonment.

The IJ denied Faddoul's requests for asylum or withholding of deportation, finding that the discriminatory treatment Palestinians, as non-Saudis, receive in Saudi Arabia did not constitute persecution. The IJ did, however, grant him voluntary departure for a period of six months, after which time he would to be deported to Honduras, as per his request, or to Saudi Arabia or

3

Lebanon if his admission to Honduras were refused.[2]  The BIA affirmed the IJ's decision and granted Faddoul an additional thirty days to voluntarily depart the United States.  Although Faddoul brought this appeal within the period of voluntary departure, that period has since expired.

## Discussion

I.   Asylum and Withholding of Deportation

We accord deference to the BIA's interpretation of the immigration statute unless there are compelling indications that its interpretation is incorrect. *Rivera-Cruz v. INS*, 948 F.2d 962, 966 (5th Cir. 1991).  Thus, absent dispositive error of law, we must affirm the Board's determination that Faddoul was ineligible for asylum or withholding of deportation if we find that its decision was supported by substantial evidence in the record.  8 U.S.C. § 1105(a)(4); *INS v. Elias-Zacarias*, 112 S.Ct. 812, 815 (1992).

Because the grant of asylum is discretionary, it involves two steps.  First, the alien must demonstrate that he has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  INA §§ 208(a), *incorporating* § 101(a)(42).  An alien's

---

[2]     The INA provides that a deportable alien is to be deported "to a country promptly designated by the alien if that country is willing to accept him into its territory."  INA § 243(a), 8 U.S.C. § 1253(a).  Faddoul designated Honduras, but there is no indication as to whether that country will accept him.  In case the designated country refuses to accept the alien, section 243(a) provides a series of seven contingencies for determining an alternate destination.  In this case, the contingencies all point to Saudi Arabia or Lebanon.

4

subjective fear of persecution will satisfy this standard if "a reasonable person in her circumstances would fear persecution if she were to be returned to her native country." *Guevara Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir. 1986), *cert. denied*, 107 S.Ct. 1565 (1987). Once the alien demonstrates his eligibility, the decision to grant asylum is within the discretion of the IJ. *Id.* at 1250. Withholding of deportation involves a slightly different analysis. To be eligible for such relief, the alien must demonstrate a "clear probability" of persecution upon return. *Rivera-Cruz*, 948 F.2d at 966. This standard contains no subjective component but requires a higher objective likelihood of persecution than the "well-founded fear" standard. *Guevara Flores*, 786 F.2d at 1250. Unlike asylum, once the alien establishes a clear probability of persecution the IJ *must* withhold deportation of the alien for so long as the threat of persecution persists. *Id.*

Faddoul claims that Saudi Arabia's denial of basic living and exit/reentry privileges to Palestinians, even those born within its borders, constitutes persecution. While the INA does not provide a precise definition of persecution, we have construed the term as requiring "a showing by the alien that 'harm or suffering will be inflicted upon [her] in order to punish [her] for possessing a belief or characteristic a persecutor sought to overcome.'" *Guevara Flores*, 786 F.2d at 1249 (quoting *Matter of Acosta*, B.I.A. Interim Decision No. 2986, 1985 WL 56042 (March 1, 1985)). At a minimum, there must be some particularized connection between the feared persecution and the alien's race, religion, nationality or other listed characteristic. Demonstrating such a connection

5

requires the alien to present "specific, detailed facts showing a good reason to fear that he or she will be *singled out* for persecution." *See Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir. 1992) (emphasis added).

In the present case, Faddoul has shown no such connection. There is no indication the Saudi government has ever arrested, detained, interrogated, or physically harmed Faddoul in any way. Nor has it harmed any of his family members still residing in Saudi Arabia. While Saudi Arabia obviously denies Palestinians certain rights enjoyed by Saudi citizens, the government does not single out Palestinians for such discriminatory treatment. Saudi law grants citizenship based solely on ancestry (*jus sanguinis*). Thus, children born of Saudi parents automatically receive Saudi citizenship while the children of all non-Saudis, regardless of their place of birth, do not. Indeed, Faddoul admits that a Palestinian born in Saudi Arabia receives the same rights and is subject to the same restrictions as a Saudi-born Egyptian, Somali or any other foreign worker. To find persecution under these circumstances would require a finding that *jus sanguinis* is persecution *per se*. We are unwilling to do so.[3] The decision to

---

[3]     While the Fourteenth Amendment to the United States Constitution grants U.S. citizenship to all persons born within this country's borders (*jus soli*), such a liberal grant of citizenship is not universally accepted. Saudi Arabia is hardly the only nation that grants citizenship based on ancestry and consequently denies it to other persons born within its borders. *Jus sanguinis* was the standard determinant of citizenship under Roman law and continues to be the primary basis for citizenship throughout much of Europe, Africa and the Near East. *See* P. WEIS, NATIONALITY AND STATELESSNESS IN INTERNATIONAL LAW 289 (2d ed. 1979); *cf.* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 211 cmt. c. (1987) (stating that both *jus soli* and *jus sanguinius*

bestow or deny citizenship is deeply-rooted in national sovereignty and must be left to the individual nation's discretion. *See De Souza v. INS*, 999 F.2d 1156, 1159 (7th Cir. 1993). In *De Souza*, the Seventh Circuit addressed a situation closely analogous to the present case. De Souza's parents were born in Goa, a former Portuguese colony which ceased to exist after its conquest by India in 1963. De Souza was born in Kenya, but she was denied Kenyan citizenship due to her foreign ancestry. *Id*. at 1157. The BIA denied her request for asylum, stating that "Kenya's laws are not directed specifically at any one group" and that deciding who should receive citizenship "is within Kenya's sovereign power." *Id*. The Seventh Circuit affirmed, holding that De Souza was not deprived of any right because she had no right to Kenyan citizenship. *Id*. at 1159. "It is well within the discretion of [a] government to decide who its citizens will be." *Id*. Accordingly, we hold that Saudi Arabia's method of conferring citizenship does not amount to persecution.

Similarly, the particular restrictions Saudi Arabia places on the rights of Palestinians and other non-Saudis also fail to manifest the kind of persecution envisioned in the INA. Again, reference to *De Souza* may be enlightening. As a noncitizen, De Souza was subject to numerous travel, living, and educational restrictions. She could only return to Kenya on a three-month tourist visa, and she was prohibited from attending Kenyan public high school. *De Souza*, 999 F.2d at 1157-58. The Court found that

---

are "universally accepted" as reflecting genuine links between the state and the individual).

7

none of these claims were tantamount to persecution and that some "border[ed] on frivolity". *Id*. at 1159. A nation's right to control access to its borders is central to its sovereignty. For this reason, all nations are entitled to place entry and travel restrictions on aliens without thereby being deemed to have persecuted them.[4] Neither do government policies denying access to certain schools amount to persecution. Saudi Arabia provides resident non-Saudis with a high school education but reserves admittance to schools of higher education to its own citizens. This admittedly discriminatory education policy is not unique.[5] In *De Souza*, the Kenyan government permitted noncitizens to attend public grade school but not high school. The Court ruled that the government could provide education for all people, some people, or no people without persecuting them. *De Souza*, 999 F.2d at 1159. Education, though undeniably important, is a matter of governmental policy rather than a fundamental right.

Alternately, Faddoul claims that Saudi Arabia's refusal to grant him a reentry visa is the result of the historical persecution of Palestinians since the destruction of Palestine in 1948.[6] He bases this argument on the literal definition of

---

[4] Our own government expressly excludes any alien "who is an officer, official, representative, or spokesman of the Palestine Liberation Organization" from admission into the United States. *See* INA § 212(a)(3)(B)(i), 8 U.S.C. § 1182(a)(3)(B)(i).

[5] In fact, the relevant United Nations Convention only requires member states to accord stateless persons the same treatment as accorded to their own nationals with respect to *elementary* education. *See* CONVENTION RELATING TO THE STATUS OF STATELESS PERSONS, art. 22(1), 360 U.N.T.S. 117 (New York 1954).

[6] Faddoul also argues that he should be accorded refugee

8

"refugee" in the INA. A "person having no nationality," such as a stateless Palestinian, who "is outside any country in which such person last habitually resided, and who is *unable* . . . to return to . . . that country because of persecution or a well-founded fear of persecution" may be considered a refugee and is thereby eligible for asylum. INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis added). Faddoul claims he is unable to return to Saudi Arabia because that country denies him the reentry privileges afforded Saudi citizens, and he is unable to return to any other country because he is stateless. He points out that the definition of refugee does not specifically state that the alien must face persecution at the hands of the country of last habitual residence, but merely that the alien can not return to that country due to some form of persecution. Nevertheless, we are unwilling to impute to Saudi Arabia the historical treatment, assertedly amounting to persecution, of the Palestinians. We do not question the unfortunate plight of stateless Palestinians, but statelessness alone does not warrant asylum. Section 101(a)(42)(A) clearly indicates that stateless individuals must demonstrate the same well-founded fear of persecution as those with nationalities. Furthermore, Faddoul's inability to obtain a reentry visa is due in part to his decision to allow his visa to expire. Once again,

status because the United Nations deems all stateless Palestinians to be "refugees". The INA does not afford asylum to all aliens that might properly be defined as refugees, rather it limits such relief to individuals who are "refugee[s] within the meaning of section 1101(a)(42)(A) of this title." *See* INA § 208(a), 8 U.S.C. § 1158(a). In any event, because Faddoul failed to present this argument before the BIA, we need not address it.

9

Faddoul is unable to demonstrate the requisite connection between his inability to return to Saudi Arabia and any specific threat of persecution that he seeks to avoid.[7]

Finally, Faddoul claims that we should at least remand the case to allow the BIA to consider certain circumstances that did not exist when these proceedings began nearly eight years ago. First, because Faddoul has been physically present in the United States for a continuous period of more than seven years, he is now eligible for discretionary suspension of deportation under section 244(a)(1), 8 U.S.C. § 1254(a)(1). Second, because PLO leader Yasir Arafat supported Saddam Hussein in the Persian Gulf War, Saudi Arabia is allegedly even less hospitable to Palestinians now than when Faddoul's deportation proceedings began.

We find that neither of these developments require remand.[8] The proper venue for proffering new evidence is not the Fifth Circuit on appeal, but the BIA through a motion to reopen the case. *Rivera-Cruz v. INS*, 948 F.2d 962, 968 (5th Cir. 1991). In *Rivera-*

---

[7]    Because Faddoul is unable to demonstrate a well-founded fear of persecution, he has not shown a "clear probability" of persecution as required for withholding of deportation. *See Guevara Flores*, 786 F.2d at 1250 ("'Establishing an *entitlement* to withholding of deportation . . . should require a greater evidentiary burden than establishing "refugee" status so as to be eligible for a *discretionary* grant of asylum.'") (quoting *Carvajal-Munoz v. INS*, 743 F.2d 562, 575 (7th Cir. 1984)) (emphasis in original).

[8]    In addition, Faddoul does not explain why he has not previously presented these arguments to the Board. The Board issued its ruling in February 1993SQtwo years *after* the Persian Gulf War. Similarly, by February 1993, Faddoul had already been physically present in the United States for approximately nine years. Thus, he apparently met the residence requirement several years prior to his hearing before the Board.

10

*Cruz*, a Nicaraguan sought asylum in the United States due to his opposition to the Sandinista government. Before his case reached the BIA, however, the Sandinistas were put out of power, and Violeta Chamorro became President of Nicaragua. The BIA took administrative notice of the change of government and concluded that Rivera no longer had a well-founded fear of persecution. *Id*. at 965. On appeal, Rivera argued for the first time that the Chamorro government was crumbling. *Id*. at 966-67. The Court recognized that aliens must have an opportunity to respond to crucial facts in administrative hearings but held that a motion to reopen, rather than remand, was the proper method to present new evidence to the BIA. *Id*. at 968-69 & n.9; *see also* 8 C.F.R. § 3.2.[9] In the instant case, because Faddoul has not yet departed the country, he is free to petition the Board to reopen his case in order to hear this evidence. Should the Board deny his request, he could then appeal the Board's denial to this Court. *Rivera-Cruz* at 968.

II. Voluntary Departure

Having denied Faddoul's appeal, we must now consider his request to order that the BIA's grant of thirty day voluntary departure commence to run from the time of our affirmance, rather than the time of the BIA decision, as the BIA directed. We

---

[9] Title 8 C.F.R. § 3.2 states, in pertinent part:

"Reopening or reconsideration of any case in which a decision has been made by the Board, whether requested by the Commissioner . . ., or by the party affected by the decision, shall be only upon written motion to the Board."

11

recognize that the circuits are split concerning our authority to fix a new voluntary departure date. The Ninth Circuit, over a vigorous dissent, has ruled that if the Board's deportation order included a grant of voluntary departure, affirming the deportation order would automatically restart the departure period as of the date of affirmance. *Contrereas-Aragon v. INS*, 852 F.2d 1088, 1092-93 (9th Cir. 1988) (*en banc*). The Court reasoned that "[t]he result of the deportation hearing, including the discretionary determinations, is *one* final order of deportation reviewable by the courts of appeals." *Id*. at 1092. Thus, the Court denied that it was actually *reinstating* anything "in the sense that [it was] exercising any discretion properly exercised by the BIA;" but rather it was "simply affirming the order of deportation with its provision for alternative discretionary relief." *Id*.[10]

In *Umanzor-Alvarado v. INS*, 896 F.2d 14 (1st Cir. 1990), the First Circuit held that it had the authority to reinstate voluntary departure because the INS could not deny a reinstatement solely because the alien brought a good faith, nonfrivolous appeal. *Id*. at 16. The Court reasoned that "to require the petitioner to apply to the district director to pass upon the matter would be pointless, for the director could not lawfully refuse the

---

[10]  As the Fourth Circuit has noted, the approach adopted by the Ninth Circuit creates a potentially anomalous result. Voluntary departure is only to be granted to an alien who (1) is a person of good moral character and (2) is not deportable for an aggravated felony. INA § 244(e), 8 U.S.C. § 1254(e). Therefore, by simply affirming a deportation order, a court might reinstate voluntary departure for an alien who has, in the intervening time, committed acts which would preclude him from eligibility for voluntary departure. *See Ramsay v. U.S. INS*, 14 F.3d 206, 213 (4th Cir. 1994).

12

reinstatement."  *Id.*

The Seventh Circuit, however, has held that it lacks the authority to reinstate a departure period.  In *Kaczmarczyk v. INS*, 933 F.2d 588 (7th Cir.), *cert. denied*, 112 S.Ct. 583 (1991), the Court ruled that while it had "jurisdiction to review the BIA's denial of asylum applications, [it] lack[ed] authority to review the INS's discretionary grant of voluntary departure." *Id.* at 598, citing Judge Kozinski's dissent in *Contrereas-Aragon* and our decision in *Farzad v. INS*, 808 F.2d 1071 (5th Cir. 1987). *Kaczmarczyk* relied primarily on the language of the regulations stating that the "[a]uthority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director."  8 C.F.R. § 244.2.[11]  Nevertheless, the Seventh Circuit echoed the same concerns raised in *Umanzor-Alvarado* that "[d]eportable aliens should not be faced with the choice between enjoying the voluntary departure privilege and securing judicial review of Board determinations." *Kaczmarczyk*, 933 F.2d at 598.  Thus, the Court warned that "[s]hould it come to our attention that the INS is wielding its discretion to withhold voluntary departure to deter applicants from seeking judicial review of BIA decisions, our scrutiny of that discretionary

---

[11]    The Board also has authority to reinstate an alien's voluntary departure. *See Matter of Chouliaris*, 16 I & N Dec. 168 (BIA 1977).  However, because "the Board has delegated to it the authority of the Attorney General [under 8 C.F.R. § 3.1(d)], *Chouliaris* is no authority for determining whether the judiciary may reinstate voluntary departure." *Farzad* at 1072.

13

exercise might expand." *Id.*[12]

The Fourth Circuit approach attempts to synthesize the holdings of the First and Seventh Circuits. In *Ramsay v. U.S. INS*, 14 F.3d 206 (4th Cir. 1994), the Court held that the decision to reinstate voluntary departure should "be left to the discretion of the District Director, who is better suited to consider the factual prerequisites which determine an alien's eligibility" for such relief. *Id.* at 213. The Court proceeded to rule, however, that a court of appeals should reinstate voluntary departure when:

> "(1) the INS is 'wielding its discretion to withhold voluntary departure to deter applicants from seeking judicial review of BIA decisions,' *Kaczmarczyk*, 933 F.2d at 598, *or* (2) 'the [INS] does *not* suggest it will present the district director with any other reason for refusing the reinstatement.' *Umanzor-Alvarado*, 896 F.2d at 16." *Ramsay* at 213.

The INS contends that this Court has already ruled that we lack any authority to reinstate voluntary departure, citing *Farzad*. *Farzad*, however, specifically chose not to reach that broad issue. The Court in *Farzad* refused to reinstate voluntary departure because the alien waited until the last day of the departure period before filing his appeal and did not apply to the Board or the district director for any extension of voluntary departure. *Id.* at 1072. The *Farzad* Court found no reason to augment the administrative remedy which the alien had neglected. *Id.* Due to the factual similarities between *Farzad* and the present case, we reach a similar conclusion. Faddoul waited until the last day of

---

[12]    The Court went on to note, however, that "petitioners have not tendered evidence which suggests that the INS has exercised its voluntary departure power in such a troubling fashion." *Id.*

14

the voluntary departure period to file this appeal, and there is no indication he ever asked the Board to extend this period beyond thirty days to allow him to appeal.[13]  Had the Board denied such a request for an extension, Faddoul could have procured our review of that denial with his appeal to us of the Board's denial of asylum and withholding of deportation.  *See Foti v. INS*, 84 S.Ct. 306, 314 (1963).  In *Foti*, the Supreme Court stated that:

> "[I]t seems rather clear that all determinations made during and incident to the administrative proceeding conducted by [an IJ], and reviewable together by the Board of Immigration Appeals, such as orders *denying voluntary departure* pursuant to § 244(e) . . . are likewise included within the ambit of the exclusive jurisdiction of the Courts of Appeals under § 106(a)."
> *Id*.

An alien in proceedings before the Board faced with the possibility of an adverse deportation decision that he may wish to appeal to the court of appeals, and who also desires voluntary departure in the event of an ultimately sustained order of deportation, should alternatively request the Board to grant a voluntary departure period that would expire within a specified time after the Board's decision, or, if a timely petition for review were to be filed within that time and thereafter were to be ultimately denied or dismissed by the court of appeals, then within a specified period following such denial or dismissal.  If the Board were to order deportation and, despite such a request for extended voluntary departure, were to allow voluntary departure but

---

[13]  Faddoul asserts that the day after he filed his petition for review he requested the district director to extend the time for voluntary departure, but that no action has been taken on this request.

15

only within the thirty day period following its decision, then, on the alien's petition for review, the court of appeals under *Foti* would clearly have jurisdiction to review not only the Board's order of deportation but also its denial of the alien's request for the more extended period for voluntary departure.[14]

In the present case, however, the Board has granted Faddoul all the relief he ever requested of it in respect to voluntary departure. Further, the Board still has the authority to reinstate voluntary departure "in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure." 8 C.F.R. § 244.2. Therefore, should Faddoul choose to petition the Board to reopen his case to consider new evidence, he could request that the Board reinstate voluntary departure at that time.

## Conclusion

The Board properly denied Faddoul's requests for asylum or withholding of deportation. Accordingly, the decision of the Board is AFFIRMED; and the request that we order a change of the voluntary departure date is DENIED.

---

[14]  In passing on the Board's denial of the alien's request to it for a more extended voluntary departure period, the court of appeals might well be inclined to rule in the alien's favor absent some explanation from the Board (or possibly patent on the record) showing an appropriate basis for its action consistent with not infringing on or deterring the alien's exercise of his right to judicial review.