**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 96-60009

(Summary Calendar)
_____

COSTEL ARSENE,

                                    Petitioner,

versus

IMMIGRATION AND NATURALIZATION SERVICE,

                                    Respondent.

Appeal from the United States District Court
For the Eastern District of Louisiana
(A16-057-759)

February 17, 1997

Before DAVIS, EMILIO M. GARZA, and STEWART, Circuit Judges.

PER CURIAM:[*]

    Costel Arsene, a thirty-two year old native of Romania who
entered the United States after jumping off a ship in the
Mississippi River, appeals the Board of Immigration Appeals ("BIA")
decision affirming an Immigration Judge's ("IJ") decision denying
him asylum and withholding of deportation.  We affirm.

---

    [*]    Pursuant to Local Rule 47.5, the Court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in Local Rule 47.5.4.

I

In Romania, Arsene worked for ten years as a certified technician qualified to treat industrial waste water. In 1986, a workman spotted a small American flag displayed on Arsene's desk and reported Arsene to Romanian authorities. Officers ransacked Arsene's home late one night, informing Arsene that they were searching for radios, typewriters, or "machines that can type manifest[o]s."

After searching Arsene's home for two hours, the officers handcuffed Arsene, blindfolded him, and took him to an unknown location where he was questioned for two days by unidentified security officers. They blinded him with bright lights and questioned him regarding connections in democratic countries, Radio Free Europe, and "machines" that could be used to print political documents. The officers beat Arsene on five occasions during this two-day detention, but eventually they released him after instructing him to report to a police station each week to relate his activities. Arsene made weekly reports as directed until the Ceausescu government fell in December 1989.

After the revolution, Arsene joined a pro-monarchy group that met in his apartment to plan demonstrations and prepare political caricatures. Arsene worked to identify and denounce persons who had "shot the . . . people" during the revolution. He also made speeches in several cities to express his opposition to election of a president with communist ties and to argue that individuals who

had committed acts of brutality should be brought to trial. Arsene testified before the IJ that during a pro-monarchy demonstration the police watched while members of an opposing group beat Arsene and his friends. Members of Arsene's group were arrested during legal election demonstrations, while others were dispersed with water hoses. Arsene did not testify that he was arrested on any of these occasions.[2]

Arsene decided to leave Romania in April 1994 after a district attorney friend warned him that Arsene had made enemies of "the people in power" as a result of his speeches and political activities. The friend told Arsene that the police could "find [Arsene] guilty" of unspecified crimes based on false testimony and that, if incarcerated, Arsene could be the victim of an "accident" on a prison work project. In May 1994, another lawyer friend told Arsene that he was "supposed to leave the country" because Arsene was "supposed to be in prison." In September 1994, Arsene left Romania for Turkey, where he lived for five months before coming to the United States.

Arsene testified that his brother told him that Arsene had been "convicted [of] four months of prison" since leaving Romania. The IJ nonetheless denied Arsene's request for asylum and withholding of deportation, but granted him voluntary departure.

---

[2] Arsene also testified that in 1993 he was transferred from a job at a large textile factory to an isolated city water cleaning station where he had only one co-worker, allegedly to keep him from having "contact with a lot of people."

The IJ ordered Arsene deported to Romania if he did not depart voluntarily.

In considering Arsene's appeal, the BIA reviewed some Romanian documents submitted by Arsene, noting that they indicated that "some judicial action was to be commenced" against Arsene in May 1994. The BIA observed that the documents did not specify the reason(s) for Arsene's requested presence in court, and further noted that Arsene worked in Romania without incident until September 1994. The BIA also cited a State Department advisory opinion dated May 15, 1995 that concluded that pro-monarchy views are tolerated in Romania. Thus, the BIA affirmed the IJ's decision and dismissed Arsene's appeal as to the denial of asylum and withholding of deportation. The BIA, however, vacated the order designating Romania as the country of deportation, instead designating Costa Rica as the first country of deportation and Romania as the alternative destination.

II

Absent a dispositive error of law, we will affirm the BIA's determination that Arsene was ineligible for asylum or withholding of deportation if we find that its decision was supported by substantial evidence in the record. 8 U.S.C. § 1105a(a)(4); *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S. Ct. 812, 815, 117 L. Ed. 2d 38 (1992); *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994). To warrant reversal of the BIA's decision, Arsene must "show that

the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Jukic v. INS*, 40 F.3d 747, 749 (5th Cir. 1994) (quoting *Elias-Zacarias*, 502 U.S. at 483-84, 112 S. Ct. at 817).

The Attorney General has discretion to grant asylum to refugees. 8 U.S.C. § 1158(a); *Jukic*, 40 F.3d at 749. Because the grant of asylum is discretionary, it involves two steps. *Faddoul*, 37 F.3d at 188. First, the alien must demonstrate that he has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id.* (citing 8 U.S.C. § 1158(a), *incorporating* 8 U.S.C. § 1101(a)(42)). An alien's subjective fear of persecution will satisfy this standard if "a reasonable person in [his] circumstances would fear persecution if [he] were to be returned to [his] native country." *Id.* (quoting *Guevara Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir. 1986), *cert. denied*, 480 U.S. 930, 107 S. Ct. 1565, 94 L. Ed. 2d 757 (1987)). At a minimum, there must be some particularized connection between the feared persecution and the alien's race, religion, nationality or other listed characteristic. *Id.* Demonstrating such a connection requires the alien to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." *Id.* (quoting *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir. 1992)). Once the alien demonstrates his eligibility, the decision to grant

asylum is within the discretion of the IJ.  *Id.*

Withholding of deportation involves a slightly different analysis.  To be eligible for such relief, an alien must demonstrate a "clear probability" of persecution upon return.  *Id.* This standard contains no subjective component but requires a higher objective likelihood of persecution than the "well-founded fear" standard.  *Id.*

Arsene argues that he fears persecution in Romania based on his political opinion.  Specifically, he contends that his "arrest, imprisonment, torture and constant surveillance . . . by the government officials" constitutes persecution because of his political opinion.  He also argues that his *in absentia* conviction validates the warnings from his attorney friends that he should flee Romania to avoid arrest, imprisonment and possible murder, and thus constitutes evidence of probable persecution upon return to Romania.

Arsene's arrest, imprisonment and beating, however, occurred in 1986 and his weekly reports to police ended with the 1989 revolution.  Moreover, he remained in Romania from 1989 to September 1994, engaging in public political activities without significant reprisal. *See Novoa-Umania v. INS*, 896 F.2d 1, 3, 5 (1st Cir. 1990) (explaining that substantial evidence supporting denial of asylum included fact that petitioner lived without incident for more than six months in El Salvador); *Rodriguez-Rivera*

*v. INS*, 848 F.2d 998, 1006 (9th Cir. 1988) (explaining that substantial evidence supporting denial of asylum included fact that petitioner lived undisturbed for two months after guerrilla threat).  Because Arsene does not explain the nature of the charges against him in Romania, a particularized connection between the feared persecution and his political opinions is not apparent.  *See Faddoul*, 37 F.3d at 188 ("At a minimum, there must be some particularized connection between the feared persecution and the alien's race, religion, nationality or other listed characteristic.").  His bare allegations that he faces imprisonment for his political opinions if returned to Romania and that he could be murdered in a staged prison accident are not "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."  *Elias-Zacarias*, 502 U.S. at 483-84, 112 S. Ct. at 817; *see also Jukic*, 40 F.3d at 749 (explaining that unsubstantiated allegations regarding fear are insufficient to establish persecution).

In sum, the BIA's decision is supported by substantial evidence in the record.  Accordingly, the BIA's determination that Arsene is not entitled to asylum must be upheld.  In addition, because Arsene is unable to demonstrate a well-founded fear of persecution, he has not demonstrated a "clear probability" of persecution as required for withholding of deportation.  *Jukic*, 40 F.3d at 749-50; *Faddoul*, 37 F.3d at 190 n.7.

AFFIRMED.