**Rodolfo N. SOTTO, Petitioner,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE.**

No. 83–3473.

United States Court of Appeals, Third Circuit.

Argued May 24, 1984.

Decided Nov. 26, 1984.

Vincent J. Agresti (Argued), Frank D. Angelastro on the brief, Newark, N.J., for petitioner.

Richard K. Willard, Acting Asst. Atty. Gen., Thomas W. Hussey, Donald A. Couvillon (Argued), U.S. Dept. of Justice, Washington, D.C., for respondent.

Before GARTH and SLOVITER, Circuit Judges, and FISHER, District Judge.*

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Before us is a petition for review filed under section 106(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1105a(a) (1982), from the decision of the Board of Immigration Appeals dismissing the appeal of petitioner Rodolfo Sotto from the decision of the immigration judge that denied Sotto's application for (1) suspension of deportation on the grounds of extreme hardship, and (2) asylum or withholding of deportation based on likelihood of persecution. Our standard of review is whether there was an abuse of discretion.

### I.

It is undisputed that Sotto, a citizen of the Republic of the Philippines (Philippines), entered the United States on a business visa at Honolulu in February 1971, that his visa rights expired in January 1973, and that as a non-immigrant without a visa he was deportable under 8 U.S.C. § 1251(a)(2). While he was residing in New Jersey in 1980, he was served with a notice to show cause why he should not be deported. At his September 1980 hearing before an immigration judge, Sotto conceded deportability under the statute, but applied for suspension of deportation under 8 U.S.C. § 1254(a), which provides that the Attorney General "may, in his discretion, suspend deportation" of an alien who had been continuously present in the United States for more than seven years and is "of good moral character" and "whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien ...."

Sotto also stated that he intended to apply for political asylum under 8 U.S.C. § 1158(a) giving the Attorney General discretion to grant such asylum to an alien subject to deportation who is a "refugee", defined in 8 U.S.C. § 1101(a)(42)(A) as any person "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that

* Hon. Clarkson S. Fisher, Chief Judge of the United States District Court for the District of New Jersey, sitting by designation.

country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion". Sotto also invoked a third provision, 8 U.S.C. § 1253(h)(1), which provides that, "The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion."

Under regulations of the Immigration and Naturalization Service (INS), the immigration judge initially determines all three claims, if they have been raised by the alien at the deportation proceeding. *See* 8 C.F.R. §§ 208.1(b), 236.3(a). A request for asylum under § 1158 is automatically considered as a request for withholding of deportation under § 1253(h)(1). *See* 8 C.F.R. § 208.3(b). The judge must submit the request for asylum for an advisory opinion to the Bureau of Human Rights and Humanitarian Affairs of the Department of State, 8 C.F.R. §§ 208.7, 208.10(b). Accordingly, the immigration judge adjourned the proceedings relating to Sotto so that the State Department's advisory opinion on Sotto's claim for asylum could be obtained.

In his Request for Asylum, Sotto asserted that he was a Moslem who advocated democratic reforms and autonomy for the southern, mostly Moslem, provinces of the Philippines. He claimed membership in organizations hostile to the government of the Philippines and asserted that he had been "interrogated, degraded, intimidated, and harassed" and that his former office in the Philippines had been searched and raided due to these political affiliations. R. 108. He claimed that due to political persecution he had left the Philippines to join two brothers who are United States citizens. R. 114–15. Sotto claimed that he continued to be active in opposition movements, gave speeches and lectures in various parts of the United States, and joined the "Free the Philippines Movement", R. 108, 117.

The State Department advised INS that in its view Sotto "has not established a well-founded fear of persecution within the meaning of the United Nations Convention and Protocol Relating to the Status of Refugees upon return to Philippines." R. 119. The Department questioned the basis for Sotto's claim of asylum since he had been in the United States for nearly ten years. The State Department suggested that if Sotto could establish he was active in seeking to overthrow the regime of President Marcos he would qualify.[1]

Sotto's hearing before the immigration judge recommenced on February 22, 1983.[2] The transcript of that hearing, which is supposed to be available for the use of the immigration judge, the Board of Immigra-

---

**1.** The relevant portions of the State Department's views were as follows:

> Review of the applicant's file shows that he has been in the U.S. for nearly 10 years. This being the case, we question on what basis he can claim asylum. Possibly his alleged anti-Marcos activities in the U.S., if he can establish he is active in a meaningful way in seeking to overthrow the Marcos regime would qualify him, but until such activity is established, his application does not warrant a favorable finding on his behalf.
>
> We wonder too, after all these years, why he decided to seek asylum at this time and how he supported himself while here. Though it is not so stated, quite possibly his application was taken as a result of action by your Service to deport him, hence the claim of need for asylum.

R. 120.

Petitioner claims that the advisory opinion, cited by the immigration judge, may have been biased by the foreign policy concerns of the State Department. Although a recent report concludes there may be some substance to this contention, *see* Committee on Immigration and Nationality Law. Association of the Bar of the City of New York. The Future of Political Asylum in the United States 4–6 (1984), there is no indication in the record that either the immigration judge or the Board placed undue weight on the advisory opinion in denying Sotto's claims.

**2.** The hearing had recommenced on September 9, 1982, but was adjourned when it appeared that counsel for Sotto, Gonzalo Velez, also intended to testify. Velez testified at the reconvened hearing, at which Sotto was represented by other counsel.

tion Appeals, and this court, was produced from cassette tapes of the hearing. Unfortunately, much of that transcript consists of the remark "inaudible", which occurs 214 times on the 51 transcript pages, often at crucial points of testimony. Among the relevant portions of testimony that are omitted or severely garbled are Sotto's testimony as to his former employment and anticipated persecution and hardship, R. 42–43, the information Sotto gained from a visiting Philippine Congressman about the persecution of Sotto's father, R. 49–50, the nature of his father's political activities, R. 51–52, the extent of conflict in the southern Philippines, R. 53–54, Sotto's past and present political affiliations, R. 56, 79–80, and the testimony of Gonzalo Velez, Sotto's attorney, as to the situation in the Philippines to which Sotto would return, R. 62–63.

In support of his claim for asylum and for withholding of deportation, Sotto introduced the affidavit of Bartoleme Cabanggang, a retired General of the Philippine Air Force and an elected Assemblyman in the Philippines. Cabanggang said he had long known Sotto and his family; that Sotto's father, Benito Sotto, had been a leader in support of politicians who opposed Marcos; that Sotto himself was "a rabid anti-Marcos leader"; that after martial law had been declared in 1972 Sotto was placed on a wanted list as an "opposition leader"; that because Sotto could not then be arrested (he was in the United States) other family members were arrested; and that Sotto's father had been detained, physically punished and had died from that punishment. Cabanggang's affidavit concluded,

> It is my honest opinion that if Mr. Rodolfo Sotto will step in the Philippine soil again, he will surely be arrested and detained in prison like his father and will be physically and mentally tortured like the other 4,000 political detainees in various jails, stockades, baracks [sic] and camps in remote places in the Philippines.

R. 130.

The immigration judge denied the request for asylum under § 1158(a), the with-

holding of deportation under § 1253(h)(1), and the application for suspension of deportation based on extreme hardship under § 1254(a)(1). The judge concluded that Sotto had failed to establish a "well-founded fear of persecution" or a "likelihood of persecution" if returned to the Philippines. R. 21–22. The judge found although Sotto had "stated that he did enter into some demonstrations and that he belonged to the political counsel of the Congress of the Philippines," that "there has been no evidence to show that he has been actively involved and engaged in such activity." R. 22. Similarly, although Sotto claimed to be a Moslem and claimed that Moslems have been in conflict with the Marcos government, Sotto had not shown that he was involved in this conflict. *Id.* The judge made no mention of the affidavit submitted by Cabanggang.

The judge also found no "extreme hardship". He considered in this regard Sotto's family ties in the United States, economic and political conditions "to which he is being returned," Sotto's financial status, occupation, and the possibility of legally returning to the United States. R. 23. The judge noted that Sotto would eventually be eligible for a visa to enter the United States and concluded that "it would be some hardship to return to the Philippines to wait for the issuance of a visa, but not unreasonably so." *Id.* Sotto was granted the right to depart voluntarily.

On appeal to the Board of Immigration Appeals, Sotto pressed both his claim of extreme hardship based on financial suffering and the loss of family ties, if deported, and his claim of anticipated persecution, which he supported on the basis of his membership in the Movement for a Free Philippines and in a group supporting former Senator Sergio Osmena, which he alleged would subject him to arrest. Sotto alleged that the government of the Philippines maintained a dossier on these groups, that the government would know of his affiliations because of the lectures and speeches he had given in the United States in opposition to Marcos, and that he would

be arrested on his return. Finally, Sotto claimed that the likelihood of persecution if he returned to the Philippines "rendered nugatory" any prospect of later relief through a future visa. R. 16.

The Board dismissed the appeal, concluding that the hearing was fair and that the immigration judge applied the correct legal principles. In affirming the judge's denial of Sotto's claims for asylum and withholding of deportation, the Board concluded that Sotto had "not submitted substantial, probative evidence to corroborate his fear [of persecution]." R. 1. The Board, like the immigration judge, made no reference to the Cabanggang affidavit which, on its face, constitutes substantial evidence. The Board also affirmed the denial of the claim for suspension of deportation based on extreme hardship, stating that "[a]t most the respondent would suffer only economic detriment which does not constitute 'extreme hardship' within the purview of the statute" and noting that Sotto may be within "reasonable reach of visa availability." R. 2. Sotto filed a timely petition for review.

## II.

### A.

■ The Supreme Court has recently made clear that an alien applying for withholding of deportation under 8 U.S.C. § 1253(h) bears the burden of showing "a clear probability of persecution," *INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984), which is equivalent to showing that "it is more likely than not that the alien would be subject to persecution," *id.* 104 S.Ct. at 2498, 2501. This was also the construction of § 1253(h) this court had earlier adopted. *Rejaie v. INS,* 691 F.2d 139, 146 (3d Cir.1982).

Requests for discretionary asylum under 8 U.S.C. § 1158(a) are governed by a differently worded standard, *i.e.,* that there must be a "well-founded fear of persecution". In *Stevic,* the Court focused only on the standard for claims filed under § 1253(h) and did not decide whether and/or how the standards under §§ 1158 and 1253(h) differ. 104 S.Ct. at 2498, 2501. Indeed, because the issue of discretionary asylum was not presented in *Stevic,* the Supreme Court explicitly refused to decide the meaning of the phrase "well-founded fear of persecution," the standard which 8 U.S.C. § 1101(a)(42)(A) makes applicable to requests for discretionary asylum.

Although that issue remains open in the Supreme Court, it is not open in this court. In *Rejaie, supra,* which for all practical purposes involved both a claim for withholding of deportation and an application for asylum, we held that "there is no difference" between the two standards, and that a " 'well-founded fear' ... equates with 'clear probability.' " 691 F.2d at 146. We read nothing in *Stevic* to undermine the *Rejaie* holding. Since a request to withhold deportation is frequently joined with a request for asylum in the context of deportation proceedings, it is fitting to apply congruent standards. This has also been the INS' interpretation. *See Rejaie,* 691 F.2d at 140. Significantly, Sotto does not claim before us that the judge or the Board erred in applying the "clear probability" standard to his conjoined claims for asylum and withholding of deportation.

### B.

■ We consider first Sotto's contention that the Board of Immigration Appeals and the immigration judge abused their discretion and acted arbitrarily, irrationally and contrary to law in denying his applications for political asylum and suspension of deportation. The immigration judge and the Board denied Sotto's request for asylum and withholding of deportation on the grounds that there was "no evidence" of Sotto's prior political or religious activities, R. 22, and that Sotto had "not submitted substantial, probative evidence to corroborate his fear" of persecution. R. 1. We cannot reconcile these statements with the administrative record before us which reveals at least one document that strongly corroborates Sotto's claims, the affidavit of a former general and Philippine Assemblyman, Bartoleme Cabanggang, that Sotto had been on a wanted list in the Philippines for his political activities; that his father had been arrested because Sotto could not have been and was tortured for his political

activities; and that, in Cabanggang's opinion, Sotto would be arrested, detained and tortured on his return to the Philippines. R. 130.

Neither the immigration judge nor the Board referred to this affidavit in holding that Sotto had not substantiated his claim. Counsel for the INS made no reference to the affidavit in its brief to the Board, and thus we do not know whether the Board's attention was directed to the Cabanggang affidavit. Moreover, although Sotto argued in his brief before us that the affidavit had been wrongly overlooked, Brief for Petitioner at 15–19, the INS in its brief failed to respond to this contention and failed to mention the Cabanggang affidavit at all. Instead, it argued, that Sotto "provided no objective evidence to establish a likelihood of his individual persecution" and presented an "unsubstantiated" claim, Brief for Respondent at 17, although the record contains what appears to be a facial substantiation of Sotto's claim. Only at the oral argument in response to the court's direct questions did the INS finally acknowledge that the Cabanggang affidavit was indeed the strongest evidence for Sotto. Its counsel then suggested that there were defects in the affidavit, but obviously this court is not the appropriate forum to hear such factual contentions. Instead, it is for the immigration judge and the Board to consider and assess in the first instance the merits of this central piece of evidence.

■ Although our review of the Board's findings is limited, *see* 8 U.S.C. § 1105a(a)(4); *Amezquita-Soto v. INS*, 708 F.2d 898, 902 (3d Cir.1983), and we may overturn the Board's determination of Sotto's claims only for abuse of discretion, *see id.* at 903 & n. 11; *Marroquin-Manriquez v. INS*, 699 F.2d 129, 133 & n. 5 (3d Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), we are not foreclosed from determining whether the Board followed proper procedures and considered and appraised the material evidence before it. If the administrative record fails

to reveal that such evidence has been fairly considered, the proper course is to remand the case to the INS so that the Service may evaluate such evidence and consider its effect on the application as a whole. *See, e.g., Antoine-Dorcelli v. INS*, 703 F.2d 19, 22 (1st Cir.1983); *Ravancho v. INS*, 658 F.2d 169, 176–77 (3d Cir.1981); *Santana-Figueroa v. INS*, 644 F.2d 1354, 1357 (9th Cir.1981); *Bastidas v. INS*, 609 F.2d 101, 105 (3d Cir.1979); *see generally* 2 C. Gordon & H. Rosenfield, *Immigration Law & Procedure* §§ 7.1b at 7–8, 8.11b at 8–102, 8.15c at 8–131 to 8–132 (1984).

We recognize that there is a possibility that the immigration judge or the Board may choose to discredit the Cabanggang affidavit for reasons that are within their expertise. However, if they do not articulate such reasons, we are unable to discharge our statutory obligation of review. To determine whether the administrative action was arbitrary, the courts must be apprised why evidence, relevant and persuasive on its face, was discredited. We must also review the decisions of administrative agencies to ascertain whether the proceedings were conducted with regularity, including whether the agency considered the relevant evidence. *See* K. Davis, *Administrative Law Treatise* § 29.-00–4 (1982 Supp.).

The Cabanggang affidavit appears to be important material evidence going to the heart of Sotto's claim that he would face persecution if deported to the Philippines. We will remand to the Board so that it may fully assess this evidence in the context of all of the evidence.[3]

C.

Sotto also contends that because of the serious deficiencies in the transcript, this court should either remand this case to the INS with instructions to attempt to clarify the inaudible portions of the transcript or, in the alternative, to conduct a new hearing. The INS argues this claim is untimely, both because Sotto did not raise it before the Board and because much of the

---

**3.** Since the Cabanggang affidavit was submitted to the immigration judge after the State Department had rendered its advisory opinion, the parties and the Board may wish to seek a second advisory opinion based on the record in light of this affidavit. *See* 8 C.F.R. § 208.10(b).

missing testimony could have been ascertained from Sotto or from his prior counsel who represented him at the hearing.

The scope of the omissions in the transcript is disturbing. Since we are remanding the case on other grounds and the Board will once again be required to consult the transcript, Sotto will be free to present this issue to the Board. The INS suggested at oral argument that the inaudible portions might be reconstructed from other audible testimony. The Board may wish to take steps to clarify the transcript, but we leave that, as well as the decision as to whether the parties should be given an opportunity to supplement the record, to the Board's discretion.

### III.

For the reasons stated above, the petition for review will be granted and the case remanded to the Board of Immigration Appeals for reconsideration in light of the full record, including the affidavit of Bartoleme Cabanggang.