

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-18-2007

# Thu v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-3499

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Thu v. Atty Gen USA" (2007). *2007 Decisions.* Paper 6.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/6

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 06-3499
_____

MYAT THU,
Petitioner

v.

ATTORNEY GENERAL USA,
Respondent
_____

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A97-524-773)
Immigration Judge Margaret R. Reichenberg
_____

Argued September 26, 2007

Before: AMBRO, JORDAN and ROTH, *Circuit Judges.*

(Filed: December 18, 2007)
_____

Sandy Khine

299 Broadway, Suite 803
New York, NY 10007

William J. Vandenberg  [ARGUED]
Hogan & Vandenberg
11 Bala Avenue, Suite 8
Bala Cynwyd, PA 19004

  *Counsel for Petitioner*

Christopher J. Christie
Stuart A. Minkowitz [ARGUED]
United States Attorney's Office
970 Broad Street, Room 700
Newark, NJ 07102

  *Counsel for Respondent*
   _____

   OPINION OF THE COURT
   _____

JORDAN, *Circuit Judge.*

  Myat Thu ("Thu") petitions for review of an Order of the Board of Immigration Appeals ("BIA") dismissing his appeal of an Immigration Judge's ("IJ") denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  After deciding that Thu's testimony was not credible, the IJ denied Thu's applications.  The BIA found that the IJ's adverse

2

credibility determination was reasonable and not clearly erroneous.  Because we find that the IJ failed to consider all of the evidence in the record, including particularly the United States Department of State Country Report on Human Rights Practices in Burma, we will grant the petition for review and remand the case to the BIA for further remand for a new hearing.

## I.     Factual and Procedural Background

### A.     Airport Interview

Thu is a native and citizen of Burma, which is also known as the Union of Myanmar.  He arrived in New York at John F. Kennedy Airport on September 24, 2005,  with a false passport, after having made stops in Singapore and Germany.  Although his native language is Burmese, Thu was interviewed in English at the airport by an officer of the United States Customs and Border Protection (an "asylum officer") because he said that he spoke "English and a little Japanese."  (App. at 307-08.)  When asked why he was visiting the United States, Thu stated, "I want to escape Burma for me and my family.  I cannot do anything in Burma because I have no military friends and the military controls all the jobs."  (*Id.*)  In response to whether the Burmese government threatened him, Thu replied, "If I go back to Burma, they will hurt me sometime."  (*Id.*)  In response to whether he had ever been arrested, Thu answered "No."  The final questions at the interview were documented as follows:

3

Q. Why did you leave you[r] home country or country of last residence?

A. I do not like the laws and rules in Burma.

Q. Do you have any fear or concern about being returned to your home country or being removed from the United States?

A. Yes I am afraid to return to Burma.

Q. Would you be harmed if you are returned to your home country or country of last residence?

A. The police hurt me last time.

Q. Do you have any questions or is there anything else you would like to add?

A. No.

(App. at 310.) Although Thu indicated that the Burmese police "hurt [him] last time," the asylum officer did not further pursue that subject.

B. Credible Fear Interview

Thu was detained at the Elizabeth Detention Center in Elizabeth, New Jersey, where he was interviewed by another asylum officer on September 29, 2005. During that interview,

4

which was intended to aid in determining whether Thu had a credible fear of future persecution, Thu spoke Burmese and was assisted by an interpreter.  Early in the interview, he revealed that he had a cousin named Thu Hein who lived in Miami, Florida. The asylum officer's notes go on to indicate that Thu spoke about why he feared returning to Burma.  He said that his father had been arrested in 1990, imprisoned for three and one-half years, and tortured for being an elected member of the National League for Democracy ("NLD") political party.  Although Thu said that he was not himself a member of the NLD, he did participate in 2003 in pro-democracy demonstrations against the Burmese government. Those demonstrations took place in Japan, and Thu distributed leaflets, protested when the Prime Minister of Burma came to Japan to speak at the Burmese Embassy, and wrote a letter to President George W. Bush asking for the United States to "intervene and help the people in Burma."

Thu claimed that he illegally returned to Burma in early 2005.  He stated that he could not return to Burma legally, or return to his hometown to work, because he "was afraid the government would be aware of [his] political activities in Japan." (App. at 303.)  Thu left Burma again in September 2005 because he feared getting arrested after a friend who returned to Burma with him in 2005 was arrested on the basis of political activities in Japan.  Regarding his fear of arrest because of his own political activities in Japan, Thu stated:

> After my friend's arrest I got scared and left the country.  Therefore, if I go back I will be

arrested and imprisoned for protesting against
the government in Japan. My prison time
would be up to 40 years. I was afraid to be
active in Burma because of what happened to
my father and my friend. However, I was active
in Japan. I cannot go back to Burma.

In sum, Thu explained his fear of returning to Burma as being based on, first, the imprisonment and torture of his father for engaging in political protest in Burma, second, his own political activities in Japan, and, third, the arrest of his friend for engaging in political activities similar to his in Japan. At the end of the credible fear interview, the asylum officer found that Thu had established a "[c]redible fear of persecution," and that "[t]here is a significant possibility that the assertions underlying [Thu's] claim could be found credible in a full asylum or withholding of removal hearing." (App. at 304.)

### C. Asylum Application

On October 25, 2005, Thu filed an asylum application. On the application, Thu indicated that he was not fluent in English. Thu also recounted his father's imprisonment, and stated that when he was in Japan he supported and worked with members of the NLD. While explaining his father's political involvement, Thu also stated that Thu Hein, whom he had earlier said was his cousin but whom he now identified as his brother, "was interrogated and briefly detained in Burma by government officials." Thu Hein fled Burma in

6

1991 and received political asylum in the United States in 2001.

Thu was in Thailand in 1990 when his father was arrested. He described his travels and activities after that:

> I returned to Burma for a brief period and then went to Singapore where I remained for 3 years. In 1993 I returned to Burma where I worked as a car broker. I got married in 1994 and had a daughter in 1995. I was active in underground pro-democracy groups beginning in 1995 when I helped organize and spread information about what the Burmese government was really doing. I was fearful of being arrested so I moved around a lot and didn't remain at home with my wife that often.

Thu then described, for the first time, his own arrest in Burma:

> In July 1998 while distributing pro-democracy leaflets in Bo Kyaw Market in Yangon I was arrested by 3 local police in civilian clothes who noticed what I was doing. I was handcuffed and taken away in their car to the local police station in Mingala Tun Nyunt Toownshsip [sic]. I was detained for two weeks. After arriving at the police station I was interrogated. I did not answer their questions so they became angry with me. They punched me in the face and

7

> chest, they kicked me in my back and shoulders
> with their boots and they threw glass at me.
> After two weeks I was released after signing a
> statement that I would no longer engage in
> political activities.

(App. at 384.)

By using a fake name, Thu obtained a Burmese passport in 1998 and left Burma for Japan in November 1998. Thu stayed in Japan until January 2005. As described in his credible fear interview, Thu was involved in political protests against Burma while in Japan, and he participated in NLD meetings and prepared pamphlets and leaflets describing the human rights abuses in Burma. Thu said he secretly returned to Burma in January 2005 because he missed his wife and daughter.

In September 2005, Thu learned that two fellow activists, who had returned with him to Burma from Japan, had been arrested and imprisoned. These activists had demonstrated with Thu at the Burmese Embassy in Japan and had worked with him in the underground pro-democracy movement in Burma after they returned. Fearing for his safety, Thu fled Burma on September 23, 2005, headed for the United States.

### D.    Immigration Hearing

On January 13, 2006, Thu participated in an immigration hearing. He testified in Burmese and had the aid

8

of a translator.  At the outset of the hearing, he amended his written statement to add two details and to correct the spelling of his daughter's name.[1]  On direct examination, Thu again explained the circumstances of his 1998 arrest and imprisonment, which he indicated resulted from his distributing leaflets for the NLD.  Thu described how he was arrested by three policemen in civilian clothing who transported him by car to a police station.  Upon arrival, they asked him why he was distributing the pro-democracy literature and who had asked him to distribute it.  While he was being interrogated, two police recruits hit him with their fists and kicked him in the back.  Thu said he remained imprisoned for two weeks.

Thu also recounted his activities in Japan with the Burma Democratic Action Group ("BDA") political party.  His lawyer submitted into evidence a letter dated December 31, 2005 on BDA letterhead by Nyi Zaw (the "Zaw letter"), political adviser to the BDA, that stated that Thu was a BDA "group member when he was in Japan," and that Thu and Zaw "were very strong supporters of NLD pro-democracy

---

[1] There were two amendments made by Thu's lawyer.  The first amendment added the language "four times" in reference to the number of times Thu traveled to the Burmese border in 2005 to exchange information with other pro-democracy groups.  The second amendment added the words "and daughter" to clarify that Thu met with both his wife and daughter before leaving for the United States.  Once on the stand, Thu also corrected the spelling of his daughter's name in the written statement.

moments [sic] in Japan." (App. at 319.) The letter also states that Thu and Zaw helped to "organize and participate [in] Burmese pro-democracy movements in Japan together." (*Id.*)[2]

Thu then described how he left Japan in 2005 to return to Burma. He stated that because he missed his family, he decided to risk being arrested in Burma for his activities in Japan. Direct examination ended with Thu stating that if he were to return to Burma, he would be arrested, just as his two fellow activists were arrested prior to his departure.

During cross-examination, the lawyer for the Department of Homeland Security ("DHS") focused on Thu's representations in his asylum application that he "returned to Burma for a brief period" after his father's arrest in Thailand. (App. at 384.) The DHS lawyer asked a series of questions implying that, if Thu's father's arrest made Thu afraid of the Burmese government, Thu would not have returned to Burma

---

[2] An earlier, unsigned letter allegedly written by Nyi Zaw was also submitted into evidence. This earlier letter was dated December 23, 2005 and has slightly different content. It does not state that Thu was a "member" of BDA, but does state that Thu was a "very strong supporter[] of NLD pro-democracy movements in Japan," and that he helped to "organize and participate [in] Burmese pro-democracy movements in Japan." (App. 326.) When asked on cross-examination why Zaw sent two letters, Thu stated that it was because Zaw forgot to sign the first letter. When asked why the content of the letters varied slightly, Thu stated that he did not know.

right after that arrest. Thu responded that he did not return to Burma, but instead went directly from Thailand to Singapore because once the military took power, he was not able to go back to Burma. When asked to explain why his written statement stated that he returned to Burma, Thu said that he used a dictionary when reading the statement for accuracy and must not have understood the sentence clearly, as he thought it implied that he was not able to go back to Burma at that time.

When the DHS lawyer and IJ demanded more explanation for this perceived discrepancy, Thu stated that perhaps the misstatement was due to mistranslation or to his own misunderstanding. The IJ asked how it could be due to a mistranslation, and Thu stated that perhaps the written statement reflected a mistranslation by the asylum officer or interpreter. That response rightly struck the IJ as odd, since the statement was not prepared by the asylum officer but by Thu and his lawyer. The IJ clarified with Thu which document was being referred to and that the written statement had been provided by Thu and his lawyer, not an asylum officer. Thu responded that, either way, the information in the statement was incorrect because he did not return to Burma prior to moving to Singapore. Apparently unsatisfied with Thu's response that the written statement contained a mistake, the IJ then instructed the DHS lawyer to ask Thu a third time why the statement was different from his testimony. Upon being asked a third time, Thu stated that "[w]hen I read that sentence, my understanding of the sentence is that the

situation in Burma was so deteriorating that I could not go back to Burma, that was what I understand." (App. at 254.)[3]

Thu was also asked on cross-examination why he had indicated during his airport interview that he had never been arrested in Burma. Thu stated that he was confused during the questioning and thought that the time frame he was being questioned about was between January 2005 and September 2005. He also stated that he was very "excited" during questioning and his English was not good. Furthermore, Thu stated that he was "afraid [of the officer] from within [his] heart," and feared that, if he mentioned being arrested, the officer would not like his answer. (App. at 266.)

Thu also testified that he was afraid to disclose the 1998 arrest during his credible fear interview. Thu explained that he disclosed the arrest in his asylum application and at the hearing because he had met with his lawyer and his lawyer had told him that he should disclose everything.

Finally, Thu was asked why he had stated in his credible fear interview that Thu Hein was his cousin, instead

----

[3] On redirect, Thu's lawyer elicited that Thu had in fact told him (the lawyer) that he (Thu) did not go to Burma before moving to Singapore from Thailand. In his closing argument, Thu's lawyer stated that the fact that the written statement was never corrected to reflect that Thu did not return to Burma was his (the lawyer's) mistake, and that "the respondent should not bear the burden of being thought incredible regarding that." (App. at 286.)

12

of his brother. He answered, "I was afraid that because of me he might be in trouble. That was why I did not mention him as my blood brother. ... So if we are not brothers, then if something happened to me happen [sic] then I will be the only person that have to face that problems [sic]." (App. at 270-272.)

### E.     The IJ's Decision

At the conclusion of the January 13, 2006 hearing, the IJ denied Thu's claims and ordered him removed. The IJ based her decision on a finding that Thu was not credible in his testimony. In particular, the IJ was troubled by the discrepancy between Thu's testimony and his written statement about whether he had returned to Burma in 1990. The IJ found it "completely incredible" that Thu could "interpret a statement, 'I returned to Burma,' as anything other than saying 'I returned to Burma.'" (App. at 69.) The IJ's disbelief was also based on Thu's having made amendments to his written statement at the beginning of his hearing but not changing the statement about returning to Burma.[4] The IJ acknowledged that on redirect there was testimony that, one week before trial, Thu met with his lawyer to discuss his case and clarified that he had not returned to Burma prior to moving to Singapore from Thailand. The IJ, however, stated that "I don't have to rely on what happened a week before the hearing. I am entitled to rely on what the respondent told me under oath at the beginning of the hearing on January 13th of 2006." (App. at 69.)

---

[4]*See supra* note 1.

13

The IJ also noted Thu's failure to disclose the 1998 arrest during his airport interview and credible fear interview. She described the arrest as "the centerpiece of any past persecution claim ... since that would have been the only time the respondent suffered any personal problem with the Burmese Government." (App. at 71.) According to the IJ, Thu's explanation that he was afraid to disclose the arrest at the airport interview would have been plausible if Thu had not also failed to mention it at his credible fear interview, where, with a translator, he was told to disclose all significant events and that the information would be kept confidential. The IJ viewed the lack of documentation about the arrest as important, suggesting that some documents or statements should have been forthcoming from his family in Burma to corroborate his arrest.

The IJ further found that if she ignored the 1998 arrest and the credibility issues associated with Thu's testimony about it, and focused only on his activities in Japan with the BDA and the NLD and the subsequent arrest of his fellow demonstrators upon returning to Burma from Japan, those political activities and consequences were not enough to establish a well-founded fear of persecution. As support for that finding, the IJ reasoned that there was no proof that the Burmese government knows or cares that Thu demonstrated outside of the Burmese embassy in Japan and supported the BDA. Furthermore, the IJ said, because Thu had no corroborating evidence to show that his fellow pro-democracy demonstrators were arrested, their arrest could be fictional, and, even if the arrests did occur, that did not mean that Thu would be arrested if he returned to Burma. The IJ concluded

14

that, if she were to assume that Thu was arrested in 1998 and later worked with the BDA in Japan, Thu's case would be stronger, and she could find that he had established a well-founded fear of future persecution.

The IJ also denied Thu's application for withholding of removal. She reasoned that Thu's failure to show a well-founded fear of persecution, which is the standard for receiving asylum, meant that he necessarily also failed to meet the higher standard necessary for withholding of removal. The IJ denied Thu's claim under the CAT because she found that he was not credible or persuasive in showing that it is more likely than not that the Burmese government would torture him upon his return.

### F.    The BIA Decision

On June 22, 2006, the BIA dismissed Thu's appeal. The BIA held that the IJ had identified inconsistencies in Thu's testimony that were not convincingly explained and that the IJ's credibility determination was therefore not clearly erroneous. The BIA specifically noted Thu's failure to reveal his 1998 arrest during the airport interview and credible fear interview as being a "significant omission," and mentioned Thu's inability to corroborate his arrest by having family members in Burma send pertinent documentation.

Thu now petitions this court for review of the BIA's decision.

## II.    Jurisdiction and Standard Of Review

We have jurisdiction to review the BIA's final decision pursuant to 8 U.S.C. § 1252(a)(1). In cases where the BIA has based its decision on the IJ's adverse credibility analysis, we may review both the BIA's opinion and the IJ's opinion. *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 152-53 (3d Cir. 2005). Adverse credibility determinations must be upheld if supported by substantial evidence, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and "can only be reversed if the evidence is such that a reasonable factfinder would be compelled to conclude otherwise." *Chavarria v. Gonzales*, 446 F.3d 508, 515 (3d Cir. 2006). "In particular, we uphold the IJ's adverse credibility determinations if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. In making an adverse credibility finding, the IJ must supply specific, cogent reasons why the applicant is not credible." *Chukwu v. Attorney Gen.*, 484 F.3d 185, 189 (3d Cir. 2007). Moreover, an examination of the record must also reveal that "the alien has not supplied a convincing explanation for ... discrepancies and omissions." *Xie v. Ashcroft*, 359 F.3d 239, 243 (3d Cir. 2004).

Although our review of the BIA's rulings is limited, "we are not foreclosed from determining whether the BIA followed proper procedures and considered and appraised the material evidence before it. If the administrative record fails to reveal that such evidence has been fairly considered, the proper course is to remand the case ... so that the [IJ] may evaluate such evidence and consider its effect on the application as a whole." *Sotto v. INS*, 748 F.2d 832, 837 (3d Cir. 1984).

16

### III. Discussion

#### A. Asylum

Under 8 U.S.C. § 1158(b), "[t]he Attorney General may grant asylum to an alien who demonstrates that he or she is a refugee[.]" *Gao v. Ashcroft*, 299 F.3d 266, 271-72 (3d Cir. 2002). A refugee is defined by statute as a person who is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the] country [of that person's origin or habitual residence] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(42)(A); *see also Gao*, 299 F.3d at 271-72.

To establish eligibility for asylum on the basis of past persecution, an applicant must show: "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Gao*, 299 F.3d at 272 (*quoting Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000)). To establish eligibility for asylum based on a well-founded fear of future persecution, an applicant must show "that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country." *Id.* (*quoting Elnager v. INS*, 930 F.2d 784, 786 (9th Cir. 1991)). Persecution has been defined by the Third Circuit and the BIA "to include threats to life, confinement,

torture, and economic restrictions so severe that they constitute a threat to life or freedom. By contrast, ... generally harsh conditions shared by many other persons do not amount to persecution." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (internal citations and quotation marks omitted).

On appeal, Thu argues that the IJ's denial of his application for asylum was erroneous because he did suffer past persecution and does have a well-founded fear of future persecution. He contends that the inconsistencies cited by the IJ were minor and do not go to the heart of his asylum claim. Moreover, he says, the explanation as to why he did not mention the 1998 arrest to the asylum officers is reasonable, especially in light of the repressive practices of the Burmese government. Finally, he argues that the IJ's denial of his asylum claim was erroneous because the IJ did not consider evidence of human rights abuses in Burma, such as that set forth in the 2005 U.S. Department of State Country Reports on Human Rights Practices in Burma (the "Country Report"), and in the 2006 Amnesty International Report, the 2006 Human Rights Watch Overview on Burma, and the U.S. Department of Treasury Overview of Sanctions on Burma (collectively the "other Burma reports").

The IJ denied Thu's claim for asylum for two reasons. First, as earlier described, she found that his testimony lacked credibility because of inconsistencies between his testimony at the hearing and his statements in interviews during his first week in the United States and in his asylum application. Second, she found that, without taking into account his alleged 1998 arrest, which she evidently believed did not

18

occur, his other experiences and those of his friends were not enough to establish a well-founded fear of persecution. We focus on her second reason first.

### 1. Well-founded fear of persecution

The IJ stated in her opinion that Thu's pro-democracy activities with the BDA in Japan and with the NLD in Burma are not enough to establish a well-founded fear of persecution on account of his political opinions. She did not elaborate on why she believed that Thu's political activities were not enough to the meet the "well-founded fear" standard. Her primary concern seemed to be that Thu had provided no proof that the Burmese government was aware of his political activities. It may be that the IJ had some additional reasons for her finding that Thu's activities would not raise a well-founded fear of persecution, but we do not see any reflected in the record. The relatively perfunctory dismissal of Thu's testimony about his fear is especially troubling because of the conditions in Burma described in the State Department Country Report and other Burma reports.

The Country Report describes Burma as a nation repeatedly betrayed by its government in terrible ways. The Report states that Burmese citizens are subject to arbitrary arrest and detention,[5] denial of fair judicial proceedings,[6]

---

[5] "[T]he Government routinely used arbitrary arrest and incommunicado detention. The Penal Code allows authorities to extend sentences after prisoners have completed their original sentence, and the Government makes regular use of

19

constant surveillance and monitoring of movements,[7] virtual elimination of freedom of speech and press,[8] elimination of any meaningful opportunity for peaceful assembly and association,[9] and elimination of freedom of religion.[10]  And

_____

this provision ... ."  (Supp'l App. at 360.)

[6] "[T]he Government continued to rule by decree and was not bound by any constitutional provisions providing for fair public trials or any other rights."  (Supp'l App. at 362.)

[7] "Through its pervasive intelligence network and administrative procedures, the Government systematically monitored the travel of all citizens and closely monitored the activities of many citizens, particularly those known to be active politically."  (Supp'l App. at 363.)

[8] "The law permits the Government to restrict freedom of speech and press ... . The Government continued to arrest, detain, convict and imprison citizens for expressing political opinions critical of the Government, and for distributing or possessing publications in which opposition opinions were expressed.  Security services also monitored and harassed persons believed to hold antigovernmental opinions ... . In all regions of the country, the Government continued to use the force to prohibit all public speech critical of it by all persons." (Supp'l App. at 367.)

[9] "An ordinance officially prohibits unauthorized outdoor assemblies of more than five persons ... . On April 17, the Government allowed the NLD to re-open its Rangoon headquarters, closed following the May 2003 attack.

20

this is only a partial listing of the depredations attributed to the government in Rangoon.[11]

That is the background that must in fairness be considered when reviewing Thu's testimony. Thu explained

---

However, all other NLD offices remained closed by Government order and the NLD could not conduct party activities outside its headquarters building. The nine other legally registered political parties were required to request permission from the Government to hold meetings of their members ... . The Government restricted freedom of association, particularly in regard to members of the NLD, pro-democracy supporters, and those who contacted exile groups." (Supp'l App. at 369.)

[10] "The Government has governed without a Constitution since 1988. Constitutional support for freedom of religion does not exist ... . [R]eligious adherents [were forced to] register[] with the authorities ... . The Government's pervasive internal security apparatus sought to infiltrate or monitor meetings and activities of virtually all organizations, including religious ones." (Supp'l App. at 369.)

[11] While not in the record, we note that Burma was featured prominently in international news on the very day this case was argued. The Burmese government was reportedly preparing for a massive crackdown on pro-democracy political demonstrations. *See, e.g.*, *Burma's Junta Imposes Curfew, Bans Gatherings*, Washington Post, Wednesday, September 26, 2007, at A01.

that he had demonstrated outside of the Burmese embassy in Japan against his country's government, and that he had also distributed pro-democracy literature and attended BDA meetings in Japan. Furthermore, he testified that he was active in the pro-democracy movement in Burma, that his father was imprisoned for his activities with the pro-democracy movement in Burma, that he has a brother who was questioned by the Burmese authorities for his political involvement and, as a result, fled to the United States for asylum, and that two of his fellow pro-democracy demonstrators were arrested by authorities upon their return to Burma from Japan.

Thu introduced two letters that he claims prove he was heavily involved in political activities disapproved by the Burmese government, and which, if accepted as truthful, show he is indeed likely to be someone of whom the Burmese authorities are aware. First, he introduced the Zaw letter, written on BDA letterhead, that stated Thu was a BDA "group member when he was in Japan," and that Thu and Zaw "were very strong supporters of NLD pro-democracy moments [sic] in Japan." (App. at 319.) The Zaw letter goes on to state that Thu helped to "organize and participate [in] Burmese pro-democracy movements in Japan." Second, Thu provided a letter written by U Thang (the "Thang letter") on December 14, 2005, which was not mentioned by the IJ in her opinion.[12]

---

[12] This letter is in the record and was submitted to the IJ by Thu's counsel under title of a "supporting document" on December 21, 2005, but it is not clear that it was introduced into evidence at the hearing.

22

Thang stated in his letter that he is the Chief Editor of the New Era Journal, which is financed by the National Endowment for Democracy in Washington, D.C. and "edited here in Florida, America and printed in Thailand to distribute secretly inside Burma as an organ for democracy forces."[13] Thang's letter reveals that Thu's name is associated with the pro-democracy movement in Japan, as he stated:

> In my Tokyo files I had noticed that Myat Thu's name appeared occasionally. I learnt that he was active there for the pro-democracy movements. His name appeared with the movements means his future is not good to return to his mother land. I knew about many men like him had disappeared in Burmese military prisons upon their return. They went back home after participating in the movements abroad. They were not wise.
>
> . . . .
>
> If [Thu] is sent back, certainly he would suffer a long imprisonment till end of his life.

On remand, in making a determination as to whether Thu's political activities in Japan with the BDA and in Burma with the NLD establish a well-founded fear of persecution, an IJ should consider the Zaw letter, the Thang letter, the State Department's Country Report, and the other Burma reports,

---

[13] Thang's letter was accompanied by a copy of what appears to be the journal's front page.

all of which are deserving of some comment and analysis in the course of making that determination.[14]  *See Sotto*, 748 F.2d at 837 ("If the administrative record fails to reveal that such evidence has been fairly considered, the proper course is to remand the case ... so that the [IJ] may evaluate such evidence and consider its effect on the application as a whole.").

### 2. Credibility

We have provided a relatively extensive recitation of facts to make the point that, while we do not presume to make a credibility determination, this record appears to present a close case.  The IJ herself acknowledged as much, and at least one asylum officer found, following the "credible fear" interview on September 29, 2005, that Thu had indeed established a credible fear of persecution.[15]  Taken in

---

[14] Remand also gives the IJ an opportunity to consider more recent evidence of country conditions.  It may well be that events since 2005 warrant attention.

[15] "Now, assuming that he's credible, that he was actually arrested and mistreated in 1998 and then that he went after that circumstance and was active in Japan, his case would be a little bit stronger. He then might have some adverse history with the Burmese government which would at least support his speculation that maybe they would have some interest if they located him again and then found out that he was traveling on a regular basis to the border of Burma and Thailand ... . I would find, although it's a very close question,

24

consideration with evidence such as the Country Report, which relates numerous abuses of the Burmese people by their government, Thu's explanations for the inconsistencies in his testimony may be viewed differently than the IJ at first viewed them. We do not imply that they should be; only that they may be. We recognize that the IJ's job in making credibility determinations often poses significant challenges, but they are challenges that can most effectively be met by consideration of all of the facts available in the record.[16] Thus, on remand an IJ should consider Thu's explanations of any discrepancies in his statements in light of the Country Report and other evidence Thu has adduced or may be permitted to adduce. Also, given the notoriously repressive nature of the regime, an IJ should perhaps be reticent to draw negative inferences from the lack of supportive correspondence from Thu's family in Burma. That lack of support figured in the IJ's original decision and may do so again, but we counsel caution. Any reason for relying on the lack of supportive documentation from Burma should be thoroughly explained.

3.      Withholding of Removal and CAT

---

that, if he were entirely credible, he would have established a well-founded fear of future persecution based on the entirety of the record before the Court." (App. at 113-14.)

[16] Consideration of all evidence does not require comment on all evidence. However, the record of decision should reflect "that such evidence has been fairly considered." *Sotto*, 748 F.2d at 837.

We also remand this case for a new determination as to whether Thu is entitled to withholding of removal and relief under the CAT. We need not repeat the issues of concern discussed in connection with the denial of asylum; it is enough to note that the discussions regarding withholding of removal and relief under the CAT must be reconsidered based on all of the evidence, for the reasons already discussed.

## IV. Conclusion

The order of the BIA is vacated and the case is remanded to the BIA for further remand for a new hearing before an IJ.