**Chernoh Taha BARRIE, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–2988.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) March 13, 2009.

Opinion filed: July 23, 2009.

Chernoh Taha Barrie, New York, NY, pro se.

Edward C. Durant, Esq., Richard M. Evans, Esq., Blair T. O'Connor, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: SLOVITER, AMBRO and STAPLETON, Circuit Judges.

## OPINION

PER CURIAM.

Chernoh Barrie, proceeding *pro se*, petitions for review of a Board of Immigration Appeals ("BIA") decision dismissing his appeal of the Immigration Judge's ("IJ") decision denying his applications for relief from removal. We will deny the petition for review.

Barrie is a native and citizen of Guinea. He attempted to enter the United States in 2007 with another person's passport.[1] The Department of Homeland Security ("DHS") issued a notice to appear charging that Barrie was subject to removal from the United States. Through counsel, Barrie admitted that he was removable because he lacked valid travel documents,

---

1. Barrie's real name is Mamadu Billo Barrie. He has been referred to as Chernoh Barrie, the name on his travel documents, throughout the administrative proceedings.

and because he sought admission to the United States by fraud or willful misrepresentation. Barrie applied for asylum, withholding of removal, and relief under the Convention Against Torture.

In support of his applications, Barrie testified that he owned a store in Guinea from 2001 until 2006. He stated that his problems began in June 2006 when he supported a widespread union strike. Barrie explained that the persons in power in Guinea were of Soussou ethnicity, and that persons of Fula ethnicity, like himself, were suffering and wanted change in the government.

Barrie further testified that, when the June 2006 strike occurred, the military and the president's people began to destroy the market. He stated that the military asked him and other merchants to open the stores, but that he and the others refused. As a result, the military began shooting, and people were killed. Barrie stated that the military arrested many Fulani people, including himself, and accused them of destroying the country and belonging to a political party. Barrie testified that, while he was in custody, the military beat him up and interrogated him about who had encouraged him to support the strike and to insult the president. Barrie stated that persons in the military placed his hands on a table and hit his fingers, and that they beat him on the legs and feet. Barrie stated that he was beaten "about three days or about one week," A.R. at 108, and that he was detained for one month. Barrie also stated that he was released when a friend of his father, named Bogota Barrie, bribed a police officer. Barrie then stayed at the home of Bogota Barrie for six months, during which time he stayed inside for fear that he would be arrested or killed.

Barrie further testified that in January 2007, he went to live with Bogota Barrie's sibling, and he did not work. In September 2007, Bogota Barrie got Barrie travel documents and spoke with the police at the airport, enabling Barrie to leave Guinea for the United States. Barrie testified that, since his arrival, his wife has told him that the police have come to their house often and have asked about his whereabouts. Barrie believes that if he returns to Guinea he will have problems because he supported the strike and a political party, and because he got out of custody without being sentenced or having a hearing. Barrie further stated that he began supporting the UPR, a party made up of people of Fula origin, in 1998, at which time he got a party card. Barrie told people when it was time to vote and provided financial support for the party.

On cross-examination, Barrie testified that there is a difference between a UPR supporter and a UPR member, the latter of whom are more active in the party. Barrie at first stated that he was a UPR supporter, but later stated, contrary to his asylum application and statements at his credible fear interview, that he became a member as a result of his financial support of the party. Barrie also admitted on cross-examination that he lied at his airport interview about his identity. He further stated that the injuries he sustained while in detention had healed, except for an area of discomfort on his foot.

The IJ found Barrie's testimony regarding his political affiliation not credible, noting that he testified that he was a UPR member, but that he stated in his written asylum application and at his credible fear interview that he was a UPR supporter. The IJ stated that Barrie acknowledged that there was a difference between a supporter and a member, and that Barrie testified that he would be harmed based on his party membership. The IJ found that Barrie changed his testimony to comport

with documents he had submitted after he filed his asylum application which recognized him as a UPR member.

The IJ also found that Barrie did not suffer past persecution. The IJ stated that there was no evidence that he was persecuted on account of his political party. The IJ noted that Barrie testified that he was interrogated about his party affiliation while in custody, but that he stated in his asylum application only that he was questioned about the identity of the strike leaders. The IJ stated that it appeared that Barrie was taken into custody, along with many others, due to civil unrest in Guinea. The IJ found Barrie's claim that he was persecuted on account of his UPR membership not credible.

The IJ also rejected Barrie's claim of persecution on account of his Fula ethnicity, explaining that there was no evidence that Barrie was incarcerated on this basis, and that the background materials did not support a finding of a pattern or practice of persecution of the Fulas. The IJ further found that Barrie's detention did not rise to the level of persecution because the physical violence he suffered was isolated and the resulting injury was minimal. The IJ also found that, although Barrie was in hiding in Guinea until September 2007, it did not appear that anyone sought to harm him. The IJ believed that, if the government was interested in Barrie, it could have found him.[2]

In addition to denying Barrie's applications for asylum and withholding of removal, the IJ denied Barrie's claim for relief under the Convention Against Torture. The IJ explained that Barrie had not submitted evidence showing that he sustained severe mistreatment rising to the level of

torture, or that he would be personally at risk of being tortured if removed to Guinea.

The BIA affirmed the IJ's decision. The BIA found no clear error in the IJ's adverse credibility finding, stating that Barrie's testimony about his membership in the UPR party was internally inconsistent and inconsistent with his statements at his credible fear interview. The BIA also stated that Barrie provided no substantial evidence suggesting that he was tortured in the past or that any government official in Guinea would either torture him upon his return or acquiesce in his torture by others. This petition for review followed.

The record reflects that an asylum officer conducted a credible fear interview in October 2007, a little over one month after Barrie arrived in the United States. The asylum officer reported that, at the interview, Barrie "said he supported the UPR party, which he said represents the Fulani or Fulbe tribe interests, but was not a member." A.R. at 221. In his asylum application, signed in November 2007, Barrie stated, "I was a supporter of the opposition UPR party in Guinea" in response to a question asking whether he ever belonged to any organizations, such as a political party. A.R. at 211. In December 2007, Barrie submitted documents in support of his case, including a UPR membership card and an affidavit by the president of the UPR stating that he is a party member.

At his hearing in February 2008, Barrie testified on direct examination that he started supporting the UPR party in 1998, and that he had the party's card. On

---

**2.** The IJ also found it inconceivable that Bogota Barrie did not mention in his statement that he had bribed authorities to renew Barrie's passport in May 2007, and found it improbable that Barrie, who feared the government, would bring attention to himself by renewing his passport.

cross-examination, Barrie agreed with the Government that there is a difference between a supporter and a party member, that he had been a supporter since 1998, and that a supporter is someone who believes in the party but may not be a full member. Barrie also agreed that a member is someone who is more active in a political party, and that he was not as active as some party members. Barrie testified that he remained a supporter of the party.

When the Government sought to confirm that Barrie never became a UPR member, however, Barrie testified that he had become a member because he financed the party. The Government then asked:

Q: But you had told me you were a supporter, not a member, two minutes ago.

A: Yeah, that, then I forgot.

Q: Okay. So you're a supporter, is that correct?

A: At first I was supporter [sic], but lastly I was put into it as a member.

A.R. at 129. The Government indicated that Barrie had stated in his asylum application that he was a party supporter, and Barrie replied, "Yes, that's what I wrote, yes." A.R. at 129. Barrie then stated that he became a member in 2004, and the Government asked:

Q: Why do you only say that you're a supporter in your written asylum application?

A: I thought it was all the same.

Q: But you just told me that you knew that there was a difference between a supporter and a member two minutes ago. There's a difference, correct?

A: Yes, there is a little difference, yes.

Q: There's a big difference. Correct?

A: Yes.

* * *

Q: Why did you only mention that you were a supporter in your written asylum application rather than stating that you were a member?

A: There it is in my application that I think I have made a mistake.

A.R. at 130. The Government also questioned Barrie about why he did not tell the officer at his credible fear interview that he was a UPR member rather than a supporter. Barrie first responded that he did not know what he was supposed to say, and later said that he was scared. The Government also confirmed that Barrie received his party membership card and the letter from the UPR party after his credible fear interview and after he submitted his written asylum application.[3]

▇ In light of these inconsistencies, we cannot conclude that a reasonable adjudicator would have been compelled to find Barrie credible. *See Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir.2004) (stating that, under the substantial evidence standard of review, a credibility determination will be upheld unless a reasonable factfinder would be compelled to conclude to the contrary). Although Barrie argues that the inconsistencies were not significant, the IJ believed that Barrie was trying to conform his testimony to his documentary evidence. Even if Barrie's status as a party member or supporter is not central to his claim that he was persecuted based on his participation in an antigovernment strike, under the Real ID Act, an adverse

---

**3.** In his brief, Barrie states for the first time that he did not state at his credible fear interview that he was a party member because he "did not want to say that [he] was a member without proof." Pet. Br. at 9.

credibility determination can be based on inconsistencies and other factors without regard to whether they go to the heart of an applicant's claim. 8 U.S.C. § 1158(b)(1)(B)(iii). This provision applies here because Barrie's asylum application was filed after May 11, 2005, the effective date of the Real ID Act.

■ Barrie also argues that he was tortured in Guinea, and that it is more likely than not that he will be tortured if he returns to Guinea. Barrie testified that while in custody the military beat him up a lot, and that the military beat him on his fingers, legs, and feet. In his written statement, Barrie stated that a guard stepped on his legs and kicked him with his boots, and that he still has marks on his legs. Barrie stated in his brief that he did not seek treatment by a doctor after his release.[4] To the extent Barrie challenges the denial of relief under the Convention Against Torture, substantial evidence supports the conclusion that Barrie did not establish that his mistreatment rose to the level of torture. *See Francois v. Gonzales,* 448 F.3d 645, 649 (3d Cir. 2006) (setting forth regulation defining torture as an extreme form of cruel and inhuman treatment).

■ The record also does not compel the conclusion that the police would more likely than not torture Barrie upon his return to Guinea. Although Barrie testified that his wife told him that the police were looking for him, and his wife submitted an affidavit attesting to this fact, there is no evidence that the police have threatened to harm him. We recognize that the 2006 Country Report on Human Rights Practices discusses human rights abuses by Guinean security forces and their torture of detainees. The Country Report, however, also notes that political detainees received more protections than other detainees because of the attention to their cases by non-governmental organizations, and that none of the persons arrested in the June 2006 strike remain in detention. In addition, Barrie does not point to any evidence addressing the treatment of individuals who were unofficially released from prison. Substantial evidence supports the BIA's conclusion that Barrie did not establish that any government official would torture him, or acquiesce in his torture, if he returned to Guinea.

Accordingly, we will deny the petition for review.

AMBRO, Circuit Judge, Dissenting.

Mamadu Billo Barrie[5] took part in a strike in Guinea, was detained for a month, bribed his way to freedom (*i.e.,* was never officially granted release), and escaped to this country. He applied for asylum, withholding of removal, and relief under the Convention Against Torture. The Immigration Judge found him not credible for purposes of his asylum claim and rejected the CAT claim on the ground that there was no evidence that Barrie would be personally at risk of torture upon return home. The BIA affirmed and our Court now denies Barrie's petition for review. Because I would vacate the adverse credibility determination and the denial of Barrie's CAT claim, I respectfully dissent.

We can invalidate an adverse credibility finding if any reasonable adjudicator would be compelled to do so. *Kaita v. Att'y*

---

4. Barrie testified at one point that he was treated at the hospital. A.R. at 108. However, he later stated that he saw "someone who treats," but he did not go to the hospital. A.R. at 140.

5. Chernoh Taha is the false name on his travel documents.

*Gen.*, 522 F.3d 288, 296 (3d Cir.2008). I believe that is the case here. The IJ found Barrie not credible because he stated in his credible fear interview that he was a "supporter" of a political party, UPR, but before the IJ he submitted documentation showing that he was a member. The IJ characterized this as conflicting testimony but it obviously is not. Most formal members of a political party are also supporters, so initially calling oneself a supporter and later a member is not inconsistent. Because there is no indication that Barrie is not in fact a member, the only reasonable conclusion why Barrie called himself a supporter at his credible fear interview is that he did not know the distinction was relevant. Once the Government made it relevant by arguing in effect that supporters are less deserving of asylum than members, Barrie disclosed his membership. There is no evidence that Barrie tried to conceal his membership and no reason why he should want to do so. No reasonable IJ could make an adverse credibility finding on these facts.

I note that Barrie is representing himself (although he had help on his brief), has no formal education, and required an interpreter at his hearing. In this context, the attempt by the Government to play word games with him during cross-examination is troubling; the IJ and BIA's willingness to credit such behavior is more so. Because the BIA affirmed exclusively on the threshold issue of credibility, I would vacate the credibility determination and remand to the BIA to review the IJ's determinations regarding the underlying issues of past and future persecution.

I would also vacate the agency's disposition of Barrie's CAT claim because the IJ and BIA failed to consider an affidavit of Barrie's wife.[6] We may remand if the IJ and BIA did not fairly consider material evidence. *Myat Thu v. Att'y Gen.*, 510 F.3d 405, 412 (3d Cir.2007). The IJ rejected Barrie's CAT claim because "[a]lthough the State Department report clearly establishes that Guinea is known for its human rights violations, [Barrie] has not evidenced that he will be personally at risk of being tortured." A.R. at 38. But Barrie submitted evidence that he would be personally at risk. The IJ failed to consider the affidavit of Barrie's wife that she was harassed and molested in her home on several occasions by police trying to find him.[7] A.R. at 176. That affidavit supports Barrie's claim that, because he was never officially released from detention after the strike, he is subject to arrest and likely torture after he returns.

The 2006 Country Report describes a serious torture problem in Guinea's justice system. It states that Human Rights Watch has found that "security forces routinely violated the inherent right to life [and] freedom from torture." A.R. at 151. Given that torture is routine, I believe a showing that the police are actively looking for petitioner, and have harassed and molested his wife in the process, could be enough to show that it is more likely than not that he will be tortured if he returns

---

6. Although the BIA affirmed the IJ without saying that it adopted the IJ's reasoning, I can only conclude that, based on the BIA's failure to provide any CAT analysis, it effectively did so. It is therefore appropriate for this Court to consider the IJ's CAT analysis. *See Fiadjoe v. Attorney General*, 411 F.3d 135, 152–53 (3d Cir.2005)

7. While discussing Barrie's asylum claim, the IJ mentioned that "Respondent maintained that his wife has since told him that the authorities are after him," but seemed unaware that Barrie's wife had submitted an affidavit corroborating his story. A.R. at 36. In discussing the CAT claim, the IJ did not consider the harassment of Barrie's wife by the police at all.

home. The IJ and BIA erred, I believe, in not considering Barrie's wife's affidavit and I would remand for consideration of it.